649 A.2d 488

**In the Interest of David A. JONES.**

**Mildred G. Walton, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 22, 1994.

Decided Nov. 1, 1994.

Petition for Allowance of Appeal Denied May 12, 1995.

Alan R. Gilbert, for appellant.
Richard P. Nuffort, for appellee.

Before COLINS, President Judge, and FRIEDMAN, J., and KELTON, Senior Judge.

FRIEDMAN, Judge.

Mildred G. Walton [1] (Appellant) appeals from an order of the Court of Common Pleas of Lancaster County (trial court) granting David A. Jones an easement for a private road that would traverse property owned by Appellant and a second property owned by Jere and Mary Brooks and connect Jones' land to a public roadway.

The trial court found that Jones possessed title in the landlocked property involved here and granted Jones a perpetual easement and right-of-way between his property and Rawlingsville Road over and through property owned by the Brookses and property owned by Appellant. Appellant presently contests that action, asserting that because Jones could not prove that he was the legal owner of the landlocked property, he is not entitled to an easement over her land. In connection with that argument, we are asked [2] to determine whether Jones has qualified for relief under the Act of June 13, 1836, P.L. 551, *as amended*, 36 P.S. §§ 2731–2891, commonly known as the Private Road Act, and whether Appellant should have been permitted to cross-examine Jones as to the existence of heirs to the title of his alleged predecessor. Alternatively, Appellant maintains that if the easement was properly granted, then she is entitled to more damages and that she should have been permitted to erect a swinging gate at the established access road.

## I.

Section 11 of the Private Road Act, 36 P.S. § 2731, states that a person may petition the court "for a road from their

1. Appellant's husband, J. Warren Walton, died in 1987; however, prior to that time, he was also a party to this action. Following his death, Appellant succeeded to his interest.

2. Our scope of review is limited to ascertaining the validity of the court's jurisdiction, the regularity of the proceedings, reviewing questions of law, and whether there has been an abuse of discretion. *In re Private Road in Union Township*, 148 Pa.Commonwealth Ct. 522, 611 A.2d 1362 (1992).

respective lands or leaseholds" to a public roadway.[3] Appellant argues that for Jones to prevail, Jones must show that he possesses clear, legal title to the land. In doing so, Appellant assumes that because Jones has acquired title by a judgment in his favor in a Quiet Title Action, his title is insufficient to trigger rights provided by Section 11 of the Private Road Act. Appellant's premise, however, is not supported by law.

 Section 11 of the Private Road Act does not distinguish between the nature of the title, but provides only that the individual claiming a right to access be the property owner or a leaseholder. The trial court stated that the Quiet Title Action, which was never challenged, was definitive as against the world, that the time to challenge Jones' title had long passed and that as a matter of fact and law Jones was the title holder to the property.[4] Appellant has cited no authority, and

3. Section 11 of the Act, 36 P.S. § 2731, specifically provides:

> The several courts of quarter sessions shall, in open court as aforesaid, upon the petition of one or more persons, associations, partnerships, stock companies, or corporations, for a road from their respective lands or leaseholds to a highway or place of necessary public resort, or to any private way leading to a highway, or upon the petition of the chief executive officer of any executive or administrative department of the State Government for a road from any public highway across any lands of any person, association, or corporation to the boundary line of any lands owned, controlled, or administered by the Commonwealth, direct a view to be had of the place where such road is requested, and a report thereof to be made, in the same manner as is directed by the said act of thirteenth June, one thousand eight hundred and thirty-six.

4. The record reflects the following statements:

> Q. Now, you indicated you made an effort to contact them. You're not saying, are you, that you in fact named all the possible heirs in the quiet title action, are you?
>
> MR. NUFFORT: Objection, Your Honor. I think the action in quiet title speaks for itself.
>
> THE COURT: I don't see any reason for attacking the order in the quiet title action. If someone was to do that, the time for it has long gone by that the Court has to accept that as a definitive order.
>
> MR. GILBERT: Well, I have no question, Your Honor, that the order is definitive against the people against whom it was brought.
>
> THE COURT: It is definitive as against the world now.
>
> MR. GILBERT: Well, that would not be my position.
>
> THE COURT: Well that's—
>
> MR. GILBERT: That's the position I would argue in my brief.

we have found none to support her position that the trial court erred in granting Jones, as owner of the landlocked property, relief under Section 11 of the Private Road Act.

■ Moreover, once judgment was entered in the Quiet Title Action, any attack on Jones' title is collateral and impermissible. 4 Goodrich Amram 2d § 1061(b):1 (1991). Therefore, the trial court did not commit any error in restricting Appellant's cross-examination of Jones concerning his title.

## II.

■ Appellant, in claiming that she is entitled to more "appropriate damages," has failed to make specific allegations as to what those damages are and has failed to present any expert testimony as to those damages. The trial court did not allow Appellant to so speculate, and we find no error in that refusal.

> THE COURT: You will be arguing against the Court's perception of the law.
>
> MR. GILBERT: Thank you, Your Honor. For the record, may I establish just what was done as far as who was gotten into the suit and who was not?
>
> MR. NUFFORT: Your Honor, same objection.
>
> THE COURT: I'm going to sustain the objection on that.
>
> MR. GILBERT: So that I may be clear, I understand that the Court does not wish me to pursue any further questions regarding the quiet title action?
>
> THE COURT: So far as trying to attack it collaterally, that's correct.
>
> MR. GILBERT: I'm not, Your Honor. Sorry. I don't mean to attack the quiet title action. We have no quarrel with the quiet title action that was filed. We are saying it wasn't sufficient.
>
> THE COURT: Well, that's a quarrel. That's a collateral attack if I ever heard one, so that's why I'm not permitting you to—I think I have to accept that at face value.
>
> MR. GILBERT: Okay. So that the record may be clear, we are arguing in our brief that an action against certain named Defendants is not an action against all the world and does not establish the title of the Plaintiff in that case against all the world or against anyone except the persons named in the suit.
>
> THE COURT: I understand that. It is the same argument you have used with respect to the quitclaim, that you could get a quitclaim deed from ten people who might or might not have any interest in the property and it is only as good as against those people. I understand your argument.
>
> (R.R. at 72a–74a.)

■ The reasons for her appeal to the damage assessment must include an indication of what error occurred and what damages she claims entitlement to. *See Merida v. Unemployment Compensation Board of Review,* 117 Pa.Commonwealth Ct. 181, 543 A.2d 593 (1988). A reviewing body needs "*some* indication, however inartfully stated, of precisely what error(s) occurred and where the tribunal should focus its attention." *Id.* at 185, 543 A.2d at 595 (emphasis in original).

## III.

■ Finally, Appellant argues that the trial court erred by failing to address her request to erect a gate at the access road. Sections 13 and 14 of the Private Road Act, 36 P.S. §§ 2733–34, give the owner of the land over which a private access road is authorized the ability to request the court's permission to erect a swinging gate across the entrance to the private road.[5] It is within the sound discretion of the trial court to consider any special request presented by a party and grant or deny that request. However, the trial court here has failed to address this issue. Therefore, we will remand this case for the trial court's consideration of Appellant's request as to the erection of a swinging gate.

Accordingly, we affirm the trial court's decision but remand for determination of the erection of a swinging gate, which the trial court did not address.

---

**5.** Section 13 of the Private Road Act, 36 P.S. § 2733, provides:

In all cases of a private road, it shall be lawful for the owners of the land over which the same may be laid out or authorized, to apply to the court aforesaid for leave to hang and maintain at their own expense, swinging gates across the road, and thereupon the court shall direct the viewers appointed to view such road, or in case the road has been already laid out, may appoint other viewers in manner aforesaid, to inquire and report whether the same may be done without much inconvenience to the persons using such road.

Section 14 of the Private Road Act, 36 P.S. § 2734, provides:

If it shall appear to the court that a gate or gates may be hung as aforesaid, according to the prayer of the party, without much inconvenience to the person or persons using such road, they shall decree accordingly, and in such decree they shall order and direct that such gate or gates be made and kept in repair, and made easy for passing, by the respective owners of said land.

## ORDER

AND NOW, this 1st day of November, 1994, the order of the Court of Common Pleas of Lancaster County, dated August 27, 1993, at No. 1478 of 1986, is hereby affirmed; however, this case is remanded for consideration of Mildred G. Walton's request to erect a swinging gate across the entrance of the private road, which the trial court did not address.

Jurisdiction relinquished.

649 A.2d 491

**COUNTY OF DELAWARE, Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (THOMAS), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 3, 1994.

Decided Nov. 1, 1994.

232

Robert F. Kelly, for petitioner.

George J. Badey, III, for respondent.

Before SMITH and KELLEY, JJ., and KELTON, Senior Judge.

SMITH, Judge.

The County of Delaware (Employer) appeals from an order of the Workmen's Compensation Appeal Board (Board) which affirmed the referee's decision granting Moses Thomas' (Claimant) claim petition and awarding him total disability benefits, costs, and attorney fees. The issues presented are whether the Board and the referee erred in determining that Claimant met his burden of proof; failed to consider all the issues; failed to render a "reasoned decision"; erred in awarding medical and legal costs when the costs were not submitted until after the record was closed; and whether Employer failed to establish a reasonable contest to the claim petition.

On May 17, 1991, Claimant filed a claim petition alleging that he suffered a severe back injury on March 24, 1991 while working as a correctional officer. Claimant testified, in pertinent part, that he worked at Employer's prison in Thornton, Pennsylvania, for three years and was assigned to maximum security or "D Block." Claimant injured his back on March 24, 1991 when he "kicked" a cell open to allow an inmate to retrieve a television from another inmate; he heard his spinal cord snap or pop when he pulled the lever to open the cell door and felt a "tight tension" in his lower back. Claimant advised his supervisor, Sergeant Glisserman, and the nurse of his injury; the nurse sent Claimant to Sacred Heart Hospital where x-rays were taken and medication prescribed for low back pain.

Claimant further testified that Leonard F. Hirsh, M.D., a neurosurgeon, operated on his lower back in May 1991; and since the surgery his back feels much better but the doctors have not yet released him to return to work. Claimant presented the medical records of Dr. Hirsh which indicated that Claimant's extruded herniated disc was directly related to his employment activities; and a report dated June 14, 1991 from Stewart Gordon, M.D., indicated that Claimant has a well-documented work-related lumbar disc injury with a guarded prognosis and will likely be out of work for one year recovering from his back injury.

Employer presented the deposition testimony of Claimant's co-workers, Jonathan Mark Wideman and Patrick M. Lewis, Dr. Gordon, and Sally A. Nathan, claims examiner. Wideman testified that on March 24, 1991, he overheard Claimant tell Sergeant Glisserman that he had pain in his leg or back but finds it difficult to believe that Claimant had time to go from roll call at approximately 3:50 p.m. to his assigned area and then arrive injured at the nurse's station at 4:00 p.m. Lewis testified that he worked with Claimant in D Block on the day in question; Claimant looked "okay" before their shift started; and although he did not see Claimant injure himself, he knew Claimant called either the supervisor or the nurse because he obtained relief from his duties.

Dr. Gordon testified that if Claimant had symptoms of a herniated disc such as pain in his back with radiation to his leg prior to the time he kicked the cell, there is no relationship between his employment and injury. However, if Claimant's account of how the injury occurred is true, Claimant's injury is work-related. Sally Nathan testified that Claimant's claim was denied because his back injury could have been caused by a motor vehicle accident in 1986, and Claimant told her that he was "kicking cells for medication."

I

The referee found, in pertinent part, that the testimony of Claimant and the medical records of Dr. Hirsh were credible, the testimony of Lewis was consistent with Claimant's to the extent that Lewis corroborated Claimant's testi-

mony that he was "okay" while doing his job prior to his injury. The referee further found the testimony of Wideman not credible because he testified to statements he overheard and Employer never called or gave a reason for not calling Sergeant Glisserman to confirm Wideman's testimony. The referee rejected Nathan's testimony as not credible and irrelevant, and determined that Employer's contest was unreasonable because Employer denied the claim for lack of medical evidence but only presented a factual dispute. He concluded that Claimant suffered a compensable injury in the nature of a herniated disc in the course and scope of his employment, granted the claim petition, and awarded medical expenses and attorney fees. The Board affirmed the referee.[1]

On appeal to this Court, Employer argues that Claimant failed to meet his burden of proof because Dr. Hirsh's records do not deal with whether Claimant's pre-existing back problems had any effect on his current disability. In addition, Employer contends that the referee did not render a "reasoned decision" and the Board did not consider whether the referee exercised an independent review of the record prior to issuing his decision adopting, verbatim, the proposed findings of fact submitted by Claimant's attorney which included findings that inaccurately recited testimony and contained statements taken out of context.

It is well settled that the burden is on a claimant to prove that his or her injury arose in the course of and was related to employment. *Krawchuk v. Philadelphia Elec. Co.,* 497 Pa. 115, 439 A.2d 627 (1981). Where the causal connection between an injury and an alleged work-related cause is not obvious, that connection must be established by unequivocal medical evidence. *Lewis v. Commonwealth,* 508 Pa. 360, 498

---

1. This Court's scope of review is limited to determining whether findings of fact are supported by substantial evidence, an error of law was committed or constitutional rights were violated. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America),* 121 Pa.Commonwealth Ct. 436, 550 A.2d 1364 (1988). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Empire Kosher Poultry, Inc. v. Workmen's Compensation Appeal Board (Zafran),* 154 Pa.Commonwealth Ct. 276, 623 A.2d 887 (1993), *appeal denied,* 536 Pa. 648, 639 A.2d 34 (1994).

A.2d 800 (1985). Furthermore, the referee, as the ultimate factfinder, must determine issues of credibility and may accept or reject testimony, *Spring Gulch Campground v. Workmen's Compensation Appeal Board (Schneebele),* 148 Pa.Commonwealth Ct. 553, 612 A.2d 546 (1992), *appeal denied,* 533 Pa. 620, 619 A.2d 701 (1993); and may adopt, verbatim, findings of fact submitted by a party so long as substantial evidence in the record supports the findings. *Reinstadtler v. Workmen's Compensation Appeal Board (Egler, Anstandig, Garrett & Riley),* 143 Pa.Commonwealth Ct. 429, 599 A.2d 266 (1991), *appeal denied,* 530 Pa. 649, 607 A.2d 258 (1992); *Sullivan v. Workmen's Compensation Appeal Board (Philadelphia Electric Co.),* 120 Pa.Commonwealth Ct. 364, 548 A.2d 404 (1988).

■ The record is void of any evidence that Claimant suffered a pre-existing back condition in 1991. While Claimant admitted that he sustained a low back injury in an automobile accident in 1986, his testimony that he fully recovered from that injury prior to his employment with Employer was uncontested. The only evidence that Employer presented to challenge Claimant's account of when his injury occurred was the testimony of Wideman, which the referee rejected as not credible. Therefore, because Claimant's testimony regarding how his injury occurred and the medical records along with Dr. Gordon's June 14, 1991 report provide sufficient relevant evidence to support the referee's finding that Claimant suffered his injury in the course and scope of his employment, this Court will not disturb the referee's conclusion that Claimant satisfied his burden of proof.

■ In its appeal to the Board, Employer challenged the referee's findings of fact as not being supported by substantial evidence; claimed that his conclusions of law constituted an abuse of discretion or error of law because they were not based upon proper findings; and challenged the adequacy of the decision as a whole mainly because the referee did not conduct an independent review of the record. The Board and this Court have examined the record, including the testimony of each witness, and have determined that it contains substantial evidence to support the referee's findings which support

his conclusions of law and that all of the issues were properly considered by the referee. Thus the referee did not err in adopting Claimant's attorney's proposed findings of fact and the Board did not err in affirming the referee's decision. *See Reinstadtler; Sullivan.*

■ Employer's assertion that the referee's decision was not a "reasoned decision" is equally without merit because the referee rendered his decision on March 16, 1993, prior to the 1993 amendments to Section 422(a) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 834 which became effective August 31, 1993. *Shadyside Hosp./Heritage v. Workmen's Compensation Appeal Board (Berry),* 163 Pa.Commonwealth Ct. 152, 639 A.2d 1337, *appeal denied,* 538 Pa. 652, 647 A.2d 905 (1994). Prior to the 1993 amendments, the Act only required findings to be "sufficient to demonstrate that the [factfinding] function was performed." *Id.* at 161, 639 A.2d at 1342 (citing *McAfee v. Workmen's Compensation Appeal Board (Allegheny General Hosp.),* 134 Pa.Commonwealth Ct. 562, 579 A.2d 1363 (1990)). Here the referee's findings sufficiently demonstrate that the factfinding function was performed and allow meaningful appellate review because the referee clearly indicated which evidence he accepted, why he rejected certain testimony, and his findings are based upon substantial evidence.[2]

## II

### (a)

■ Employer further argues that it established a reasonable contest as its evidence supports its defense that Claimant's injury was not related to his employment but was the

---

**2.** Review of the record also demonstrates that Employer raised for the first time in its appeal to this Court the issue of whether a referee is precluded from accepting medical and legal costs submitted along with a claimant's proposed findings of fact and conclusions of law after the record is closed pursuant to an agreement between counsel for the parties and the referee. This issue is waived as it was not raised below and cannot be raised for the first time on appeal. Pa.R.A.P. 1551; *McMahon v. Workmen's Compensation Appeal Board (Volkswagen of America),* 135 Pa.Commonwealth Ct. 1, 581 A.2d 678 (1988), *aff'd,* (58 W.D.1989, filed October 19, 1990).

result of a prior motor vehicle accident; and, in the alternative, if fees were properly assessed, the case must be remanded for specific findings regarding the amount and degree of difficulty of work performed by Claimant's attorney. A prevailing claimant is entitled to an award of attorney fees pursuant to Section 440 of the Act, 77 P.S. § 996, unless an employer had a reasonable basis for contesting liability.[3] *McGuire v. Workmen's Compensation Appeal Board (H.B. Deviney Co.)*, 140 Pa.Commonwealth Ct. 68, 591 A.2d 372 (1991).

Employers have the burden to establish that their contests are reasonable, *MacNeill v. Workmen's Compensation Appeal Board (Denny's, Inc.)*, 120 Pa.Commonwealth Ct. 320, 548 A.2d 680 (1988), and the question of whether employers' contests are reasonable is one of law based on this Court's examination of the record. *Mason v. Workmen's Compensation Appeal Board (Wheeling–Pittsburgh Steel Corp.)*, 143 Pa.Commonwealth Ct. 539, 600 A.2d 241 (1991), *appeal denied*, 529 Pa. 671, 605 A.2d 335 (1992). A reasonable contest may be established where medical evidence is conflicting or is susceptible to contrary inferences and where there is an absence of evidence that the employer's contest was frivolous or filed for purposes of harassment. *Id.*

The medical evidence in the record sub judice is not conflicting in that Employer's medical expert acknowledged that Claimant is disabled and concedes that if the injury occurred as Claimant insists it did, the injury is work related. Employer's claims examiner did not identify the basis for Employer's position and Lewis' testimony corroborated Claimant's account of the injury and directly conflicted with Wideman's theory that Claimant did not have time to sustain an injury in the manner he claimed. Therefore Employer's con-

---

**3.** Section 440 provides in pertinent part:

> In any contested case where the insurer has contested liability in whole or in part, ... the employe ... in whose favor the matter at issue has been finally determined shall be awarded ... a reasonable sum for costs incurred for attorney's fee ... Provided, That cost for attorney fees may be excluded when a reasonable basis for the contest has been established....

test rested on its unfounded belief that Claimant had residual injury from his 1986 automobile accident which caused him to be disabled. The only shred of evidence tending to support Employer's theory is Wideman's testimony that while engaged in conversation, he overheard Claimant complaining about being in pain. Clearly, Wideman's testimony alone would not support a finding that Claimant suffered a pre-existing condition, and falls short of establishing a reasonable basis for Employer's contest of Claimant's claim petition.[4]

### (b)

▮▮▮ Employer also filed a motion to quash a statement in Claimant's brief on pages 7–8 regarding Employer's filing of "obstructive procedural roadblocks" and refusal to pay Claimant's attorney fees despite, among other things, the denial of its request for supersedeas. Employer contends that the statement contains immaterial and irrelevant matters which do not appear in the record. Claimant's response asserts that the statement in dispute is relevant; and relies upon Pa. R.A.P. 2744 to request costs, counsel fees and delay damages for Employer's refusal to comply with the orders of the referee, the Board and this Court. This Court may award counsel fees and damages if it determines "that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious." Rule 2744. Because the challenged statement is relevant to Employer's conduct in this appeal, Employer's motion to quash must be denied.

▮▮▮ Nevertheless, Claimant's request for additional counsel fees and damages is likewise denied. Employer argued

**4.** Employer waived its entitlement to a remand for findings as to the reasonableness of the assessed attorney fees because it failed to raise the issue before the Board. *See Eidell v. Workmen's Compensation Appeal Board (Dana Corp.),* 155 Pa.Commonwealth Ct. 254, 624 A.2d 824 (1993) (failure to challenge the assessed amount of attorney fees in an appeal to the Board renders the issue waived before the Commonwealth Court); *Delaware Valley Fish Co. v. Workmen's Compensation Appeal Board (Woolford),* 151 Pa.Commonwealth Ct. 387, 393, 617 A.2d 48, 51 (1992) ("raising the issue of reasonableness of contest does *not* preserve the issue of whether the *amount* of attorney fees assessed by the referee was reasonable") (emphasis in original).

that there was conflicting evidence regarding Claimant's injury and whether it was related to his employment. This argument was not frivolous as it demonstrates a justiciable issue not entirely without merit. *See Mercy Catholic Medical Center v. Workmen's Compensation Appeal Board (Fry)*, 114 Pa.Commonwealth Ct. 218, 538 A.2d 636 (1988) (although an employer lacked a reasonable basis for contesting a claim, additional counsel fees and delay damages are not warranted unless the appeal is frivolous or taken solely for delay). Further, Claimant presented no evidence that Employer's conduct in this appeal was taken solely for delay or that Employer's conduct is dilatory, obdurate or vexatious.

Accordingly, Employer's motion to quash and Claimant's Rule 2744 request for attorney fees and damages are both denied, and the order of the Board is correspondingly affirmed.

### ORDER

AND NOW, this 1st day of November, 1994, Petitioner's motion to quash contents of the brief filed by Moses Thomas, and Moses Thomas' request for Pa.R.A.P. 2744 counsel fees and damages are denied. The order of the Workmen's Compensation Appeal Board is hereby affirmed.

649 A.2d 728

**In re Patrick DOOLEY, Appellant,**

**v.**

**LUZERNE COUNTY BOARD OF ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued Sept. 23, 1994.

Decided Nov. 2, 1994.

Lewis W. Wetzel, for appellant.

Michael I. Butera, for appellee.

Before COLINS, President Judge, and SMITH, J., and SILVESTRI, Senior Judge.

COLINS, President Judge.

Patrick Dooley (Dooley) appeals from an order of the Court of Common Pleas of Luzerne County (Common Pleas) denying his petition under the right-to-know law (Act)[1] for access to property assessment records maintained by the Luzerne County Board of Assessment Appeals (Board). We reverse.

On March 9, 1993, Dooley, a professional title searcher, arrived at the Board's offices and requested to see the assessment card for a client's property. Dooley was denied access to the assessment records. Dooley was told that he could not inspect the assessment card itself, but would have to fill out a request form to purchase a copy of the card for a fee of one dollar ($1.00). Dooley appealed to Common Pleas to order disclosure. Common Pleas denied relief.

1. Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.4.

At the proceeding below, the Board introduced testimony to the effect that its earlier policy of allowing public inspection of the original records without Board intervention resulted in 9,000 missing cards. The Board contended that it introduced the current procedures as a security measure to preserve the records. Common Pleas found that the Board's procedures reasonably balance the Act's accessibility requirements with the need to preserve the integrity of the records. We disagree.

The Act guarantees that "[e]very public record of an agency shall, at reasonable times, be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania." 65 P.S. § 66.2. The Board is an agency subject to the Act, and the assessment cards it maintains are public records. *See Westmoreland County Board of Assessment Appeals v. Montgomery*, 14 Pa.Commonwealth Ct. 50, 321 A.2d 660 (1974). The language of the Act clearly mandates access to the Board's assessment records by means of examination and inspection.[2]

Common Pleas erred in broadening the discretion the Act confers on the subject agency. Section 2 of the Act permits the agency to set reasonable times for inspection, and Section 3, which deals with extracting and copying public records, gives the custodian "the right to adopt and enforce reasonable rules governing the making of such extracts, copies, photographs or photostats." 65 P.S. § 66.3. The mandated opening of records for inspection is unqualified except for the "reasonable times" provision. In this matter, it is uncontested that *the original records were at no time open for inspection.*

The Board and Common Pleas misconstrue the issues and holding in *Hoffman v. Commonwealth*, 71 Pa.Commonwealth Ct. 99, 455 A.2d 731 (1983). After deciding that the petitioner in that case was in fact entitled to the records in question, this Court referenced Section 3 of the Act, relating to making

2. This Court recognizes that there may be rare situations where examination and inspection may be rendered "impossible" because of the record's format or some onerous prohibition not addressed by the Act. That issue is not now before this Court.

copies, and concluded that the petitioner could not demand that the copies be in the form of addressograph labels. We noted that the records were computerized and left it to the agency's discretion whether to produce paper or electronic copies. The agency's discretion was limited to reproduction procedures and costs. The facts and issues in this case and in *Hoffman* are not analogous.

The Court of Common Pleas of Luzerne County erred in denying Dooley the right to inspect assessment cards maintained by the Board and in sustaining the Board's overly restrictive procedures. Accordingly, its order denying Dooley's petition is reversed.

## ORDER

AND NOW, this 2nd day of November, 1994, the order of the Court of Common Pleas of Luzerne County in the above-captioned matter is reversed. The matter is remanded to the Court of Common Pleas of Luzerne County with directions that it enter an order directing the Board of Assessment Appeals of Luzerne County to permit the petitioner to examine and inspect assessment records maintained by that agency in accordance with the provisions of the Act of June 21, 1957, P.L. 390, *as amended.*

649 A.2d 730

**Hiram R. JOHNSTON, Jr., Petitioner,**

**v.**

**Joseph LEHMAN, Secretary of the Department of Corrections, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted May 6, 1994.

Decided Nov. 2, 1994.

Hiram R. Johnston, Jr., petitioner, for himself.

Jill A. Devine and M. James Matthews, Asst. Counsels, for respondent.

Before McGINLEY and KELLEY, JJ., and KELTON, Senior Judge.

KELLEY, Judge.

Hiram R. Johnston, Jr., petitioner in this action, is an inmate presently in the custody of the Department of Corrections (DOC). At the time this case was originally brought, Johnston was housed in a Restrictive Housing Unit (RHU) at the State Correctional Institution (SCI), Dallas.[1]

Johnston filed a petition for review in our original jurisdiction against Joseph Lehman, Secretary of Corrections, alleging that various policies established by Lehman and his agents violate his constitutional right of access to the courts, as established by *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), and its progeny.[2] Johnston's allegations can be grouped into three categories: denial of adequate

1. It is unclear to this court where Johnston is currently confined. Johnston alleges in his motion for summary judgment filed with this court on October 15, 1992 that he was transferred to SCI–Frackville on November 13, 1991. DOC alleges in their brief in opposition to Johnston's motion for summary judgment, filed with this court on April 19, 1994, that Johnston is currently housed at SCI–Retreat. Notwithstanding the court's confusion, where Johnston is currently confined has no bearing on the motion presently before this court for disposition.

2. The U.S. Supreme Court in *Bounds* held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. The Supreme Court did not mandate access to law libraries for all prisoners, but rather left to the state the choice of "what alternative would 'most easily and economically' fulfill this duty." *Id.* at 819, 97 S.Ct. at 1493.

access to legal materials and/or trained legal assistance; denial of access to non-legal items, such as a typewriter, photocopier and a lamp, which Johnston alleges are necessary in order to allow him to pursue his pending cases; and DOC's alleged retaliatory actions against Johnston.

In support of his principal allegation that the "book paging system"[3] utilized by DOC for access to legal material is impermissible, Johnston cites *Tillery v. Owens,* 719 F.Supp. 1256, 1284–86 (W.D.Pa.1989), *aff'd* (without discussion of this issue), 907 F.2d 418 (3d Cir.1990).

In his petition for review, Johnston is only requesting injunctive relief. Johnston is asking this court to issue an injunction ordering Lehman and his agents to, *inter alia,* implement a plan to insure that Johnston and all RHU prisoners have meaningful access to the courts either through adequate access to the law library or through access to legally trained persons.

In response to the petition for review, DOC, on behalf of Lehman, filed preliminary objections which this court overruled in part and sustained in part. *See Johnston v. Lehman,* 148 Pa.Commonwealth Ct. 98, 609 A.2d 880 (1992). As a result, Johnston's claims regarding denial of a lamp, typewriter and access to a photocopier were dismissed without prejudice to raise these claims in a separate action.

On October 15, 1992, Johnston filed with this court a motion for summary judgment. Johnston alleges that he is entitled to judgment as a matter of law based on *Bounds* and its progeny.

In opposition to the motion for summary judgment DOC asserts, *inter alia,* that the motion should be denied because Johnston's claims have been addressed in two federal class action lawsuits and that Johnston's claims are moot. DOC has not filed a cross-motion for summary judgment.

---

**3.** This system allows inmates in RHU to order up to three books from the law library up to twice a week. The books are then delivered to the inmate, when available. The system also provides a limited case citation and verification service, which is performed by staff as time permits. Johnston alleges that due to staff limitations and the number of requests, delays of several weeks are common.

▆▆▆ An entry of summary judgment may be granted only in cases where the right is clear and free from doubt, if there is no issue of material fact, and if the moving party is entitled to judgment as a matter of law. *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986). In determining whether to grant a motion for summary judgment, on the critical question of whether there is a genuine issue as to any material fact, the party who brought the motion has the burden of proving that no genuine issue of fact exists. All doubts as to the existence of a genuine issue of a material fact are to be resolved against the granting of the summary judgment. *Penn Center House, Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989).

This court believes that Johnston's motion for summary judgment should be denied and further that Johnston's petition for review should be dismissed as moot for the following reasons.

DOC points out to this court that there is currently pending in the United States District Court for the Eastern District of Pennsylvania, a class action lawsuit challenging various conditions of confinement for Pennsylvania prisoners. This class action lawsuit, *Austin v. Pennsylvania Department of Corrections,* No. 90–7497, deals with the claim of access to the courts Johnston presents here and seeks declaratory and injunctive relief. *See* Exhibit A to DOC's brief in opposition to motion for summary judgment. *Austin* specifically governs access to the prison law libraries for prisoners in restricted housing. *Id.*[4]

DOC urges this court to follow federal precedent and decline to consider Johnston's request for injunctive relief pending before this court. DOC, relying on federal law, contends that since the *Austin* class was certified under Federal Rule of Civil Procedure 23(b)(2), Johnston is a member of that class

---

**4.** DOC also relies upon *Imprisoned Citizens Union v. Shapp,* No. 70–3053 (E.D.Pa.) to support its argument; however, the *Austin* litigation is sufficient to convince this court that Johnston's claims are encompassed in a federal class action suit.

whether he wishes to be or not; therefore, Johnston cannot pursue injunctive relief in a separate action.

Federal case law holds that individual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action. The federal courts have so held to prevent waste of judicial effort in deciding the same issues already being litigated in a class action suit in which the individual plaintiff is a member of the class bringing the suit and therefore would be bound by any decision in the case. *See Bryan v. Werner*, 516 F.2d 233 (3d Cir.1975); *McNeil v. Guthrie*, 945 F.2d 1163 (10th Cir. 1991) (Class members may bring individual suits only if they seek equitable relief and their claims are not being litigated within boundaries of class action or if they seek money damages); *Monks v. United States Parole Commission*, 463 F.Supp. 859 (M.D.Pa.1978).

We believe, as do the federal courts, that in the interest of judicial economy and to prevent interference with the ongoing class action suit, that this court should decline to decide individual suits seeking injunctive relief when the claims are being litigated in a class action suit of which the individual plaintiff is a member. It is clear that the claims which Johnston presents before this court are encompassed in the *Austin* litigation.

Accordingly, we deny Johnston's motion for summary judgment.[5]

## ORDER

NOW, this 2nd day of November, 1994, it is hereby ordered that the motion for summary judgment filed on behalf of Hiram J. Johnston, Jr. is denied.

5. As pointed out previously in this opinion, DOC did not file a cross-motion for summary judgment nor does DOC even request such relief in its opposition brief. It is clear to this court that DOC should have filed a cross-motion for summary judgment; however, without a cross-motion, this court is prohibited from entering summary judgment in favor of DOC. *See Bensalem Township School District v. Commonwealth*, 518 Pa. 581, 544 A.2d 1318 (1988) (entry of summary judgment for non-moving party was improper).

649 A.2d 732

**George M. ATEN, Appellant,**

v.

**COMMONWEALTH of PENNSYLVANIA, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING.**

Commonwealth Court of Pennsylvania.

Submitted July 22, 1994.

Decided Nov. 3, 1994.

Dennis J. Stefanik, for appellant.

David R. White, Asst. Counsel, Appellate Section, and Timothy P. Wile, Asst. Counsel In–Charge, Appellant Section for appellee.

Before SMITH and KELLEY, JJ., and KELTON, Senior Judge.

SMITH, Judge.

George M. Aten (Licensee) appeals from an order of the Court of Common Pleas of Washington County which dismissed his appeal from the Department of Transportation, Bureau of Driver Licensing (DOT) six-month disqualification of his commercial driver's license pursuant to Section 1611(f) of the Vehicle Code, 75 Pa.C.S. § 1611(f),[1] because of a West

---

1. 75 Pa.C.S. § 1611(f) of the Vehicle Code provides:

 **(f) Disqualification for failure to have CDL.**—The department shall disqualify any person from driving a commercial motor vehicle for six months upon receiving a certified record of the person's conviction of violating section 1606(a), except as provided in 1606(d)(6).
 75 Pa.C.S. § 1606(a) provides in pertinent part:

 **(a) When required.**—No person, ... shall drive a commercial motor vehicle unless the person has been issued and is in immediate possession of a valid commercial driver's license....
 75 Pa.C.S. § 1606(d)(6) provides in pertinent part:

 (6) No person shall be convicted of violating subsection (a) if the person produces at the office of the issuing authority within 15 days of the violation:

Virginia conviction for driving a commercial motor vehicle without holding a commercial driver's license. The issues raised on appeal are whether the Pennsylvania and West Virginia offenses for driving without a commercial driver's license are essentially similar when Pennsylvania's Vehicle Code allows an exception to Section 1611(f) to avoid conviction; and whether Pennsylvania requires that the offenses be essentially similar before a commercial driver's license will be suspended for violation of the driving laws of another state.[2]

It is uncontested that Licensee was convicted in West Virginia for operating a commercial motor vehicle without holding a commercial driver's license after he was issued a citation for the offense in April 1992. Under West Virginia law, a commercial driver must have a commercial driver's license in his or her possession at all times while driving. W.Va.Code § 17E–1–7. Licensee testified that at the time of the citation he held a Pennsylvania interim Class 3 license; had taken and passed a Pennsylvania qualifying examination to convert it to a commercial driver's license, but did not receive the proper forms to obtain his commercial driver's license photo;[3] and that he sent a copy of his photo commercial driver's license to the West Virginia magistrate soon after

> (i) a commercial driver's license valid in this Commonwealth at the time of the violation; ...

2. Section 1611(h) provides:

> **(h) Conviction in Federal court or another state.**—For purposes of the provisions of this section, a copy of a certified record of conviction or a copy of a certified record of administrative adjudication from a Federal court or another state for an offense essentially similar to those offenses which would result in disqualification in this section shall be treated by the department as if the conviction had occurred in this Commonwealth.

3. Licensee presented a September 19, 1993 letter from DOT confirming his compliance with the test requirements. In addition to confirming his compliance, the letter also noted that the commercial driver's license endorsement granted by the examiner was valid for only 120 days after he completed his examination requirements; on December 2, 1991, his interim license was decertified and converted to a non-commercial Class C driver's license which does not qualify a person to drive a commercial motor vehicle. Licensee testified that after receiving the West Virginia citation, he contacted DOT to obtain the proper forms to process his photo commercial driver's license.

May 5, 1992 when DOT issued Licensee's commercial driver's license. In July 1993, Licensee was stopped in West Virginia and advised that he had an outstanding citation for the April 1992 violation and was taken directly to a magistrate's office where he paid the fine.

■ Under Section 1611(h) of the Vehicle Code, a certified copy of a conviction in another state for an essentially similar offense shall be treated as if the conviction had occurred in this Commonwealth. DOT presented certified records to the trial court of Licensee's April 1992 West Virginia citation, an abstract of judgment dated July 13, 1993 confirming that he paid the fine imposed, and an August 12, 1993 notice from DOT that pursuant to Section 1611(f) Licensee was disqualified from operating a commercial vehicle for six months. Licensee appealed the notice of suspension to the trial court which articulated long-standing and well-established principles of law governing license suspension appeals and held that Licensee's appeal could not be sustained.

■ In a license suspension appeal this Court's scope of review is limited to determining whether the trial court's findings are supported by competent evidence, whether errors of law have been committed, or whether the trial court's determinations demonstrate an abuse of discretion. *Department of Transportation, Bureau of Driver Licensing v. Tarnopolski*, 533 Pa. 549, 626 A.2d 138 (1993). Courts of this Commonwealth have consistently recognized that a license suspension is a collateral civil consequence of a criminal conviction and in an appeal from the suspension, a licensee may not attack the validity of the underlying criminal conviction. *Commonwealth v. Duffey*, 536 Pa. 436, 639 A.2d 1174, cert. denied, —— U.S. ——, 115 S.Ct. 223, 130 L.Ed.2d 149 (1994). The only relevant issues in a civil license suspension appeal are whether the motorist was in fact convicted and whether DOT acted in accordance with applicable law. *Amoroso v. Department of Transportation, Bureau of Driver Licensing*, 152 Pa.Commonwealth Ct. 215, 618 A.2d 1171 (1992).

256

■ Licensee maintains that because the exception to Section 1611(f) of the Vehicle Code allows a licensee to avoid conviction by producing a commercial driver's license within fifteen days of a violation of Section 1606(a), his West Virginia offense is not essentially similar to the offense which would result in disqualification under Section 1611(f). He contends that the legislature made a specific exception to the Pennsylvania statute to prevent a driver who possesses a commercial driver's license from being convicted under Section 1606(a) and that no such exception exists to the West Virginia law. The argument that because of this distinction the two offenses are not essentially similar unfortunately misses the issue. That Section 1611(f) provides an exception to disqualification of a commercial driver in Pennsylvania is inconsequential in determining whether elements of the offenses are essentially similar, specifically where the driver lacks a valid commercial driver's license at the time of the offense and was unable to produce one within fifteen days of the offense to avoid disqualification. Moreover, Licensee cites no authority to augment his argument nor has he demonstrated to the Court that he would not have been convicted had the offense been committed in Pennsylvania.

■ Licensee also contends that the trial court compared the punishments between West Virginia and Pennsylvania law to determine if the offenses are essentially similar and that the court erred because it failed to compare the language of each offense to decide if they are essentially similar. This contention misstates the trial court's decision. The trial court appropriately clarified that it is the "offense" and not the statute of the other state which must be essentially similar to the offense proscribed in Pennsylvania. Licensee was convicted in West Virginia of driving a commercial motor vehicle without holding a commercial driver's license; his offense is essentially similar to the offense set forth in Section 1606(a) of the Vehicle Code which prohibits a person from driving a commercial motor vehicle unless he or she has been issued and is in immediate possession of a valid commercial driver's license.

In *Commonwealth v. Whisnant,* 390 Pa.Superior Ct. 192, 568 A.2d 259 (1990), the Superior Court considered the question of Pennsylvania DUI offense equivalency with a substantially identical driving while under the influence statute in New Jersey; the court wrote that the critical focus of inquiry is on the elements of the offense. In *Commonwealth v. Bolden,* 367 Pa.Superior Ct. 333, 532 A.2d 1172 (1987), the court found offense equivalency after examining both the nature and definition of burglary offenses under Pennsylvania and Colorado penal statutes, reiterating that the fundamental inquiry is on the elements of the offense.

This Court finds little distinction, if any, between the elements of the motor vehicle offenses in the case sub judice; in both, a commercial driver who operates a commercial motor vehicle without "holding" or being "in immediate possession" of a valid commercial driver's license commits an offense under West Virginia law or the Vehicle Code, respectively. Thus whether a driver is "holding" a valid commercial driver's license or is "in immediate possession" of one is irrelevant to the inquiry as elements of the Pennsylvania and West Virginia offenses are essentially similar.

■ Notwithstanding the challenges raised, the net effect of Licensee's appeal amounts to a collateral attack on the underlying conviction. Licensee did not appeal the West Virginia conviction and may not presently do so before this Court to defeat his disqualification under Section 1611(f) of the Vehicle Code. Licensee paid the West Virginia fine which constituted a guilty plea, *Department of Transportation, Bureau of Driver Licensing v. McBrearty,* 123 Pa.Commonwealth Ct. 257, 553 A.2d 1036 (1989); and having been convicted of the motor vehicle offense charged, neither this Court nor the trial court may examine circumstances of the underlying conviction. *See Duffey; Department of Transportation, Bureau of Traffic Safety v. Calloway,* 60 Pa.Commonwealth Ct. 647, 432 A.2d 322 (1981). The trial court's order dismissing Licensee's appeal is affirmed.

258

## ORDER

AND NOW, this 3rd day of November, 1994, the order of the Court of Common Pleas of Washington County is affirmed.

649 A.2d 736

**ERIE INSURANCE COMPANY/ERIE INSURANCE EXCHANGE, Appellant,**

v.

**Jerry L. FLOOD, Jr., Michael G. Case, Trudy Case, Michael Case, Shawn F. Perks, and Commonwealth of Pennsylvania, Department of Transportation.**

Commonwealth Court of Pennsylvania.

Argued Sept. 19, 1994.

Decided Nov. 3, 1994.

Joseph P. Green, for appellant.

James M. Horn, for appellees.

Before PELLEGRINI and KELLEY, JJ., and SILVESTRI, Senior Judge.

KELLEY, Judge.

Erie Insurance Company (Erie) appeals from the July 19, 1993 order of the Court of Common Pleas of Centre County which affirmed its order dated January 29, 1993, directing that an insurance policy issued by Erie provide coverage to the insured's minor son for a car accident, and which denied Erie's motion for post-trial relief. We affirm.

In this appeal, Erie raises the following issues: (1) whether the trial court erred in concluding that the insured's minor son was a resident of the insured's household for purposes of liability coverage; and (2) whether the trial court erred in allocating the burden of proof of non-coverage to Erie.

Erie issued a policy of automobile liability insurance to Barbara Flood (mother), the mother of sixteen-year-old Jerry Flood (Son). The policy had an effective term of May 1, 1989 to May 1, 1990. On September 9, 1989, a single motor vehicle accident occurred involving a car driven by Son. As a result of the accident, Michael Case and Shawn Perks, passengers in the car, were injured. Each separately commenced a civil action against Son.[1] Erie filed a declaratory judgment action seeking a determination as to its obligation to defend Son with respect to these civil actions.

Son was not specifically named or identified as an insured under the terms of his mother's policy. Under the terms of the insurance policy, an individual who is not a named insured must be a "relative" of the named insured in order to receive liability protection. A "relative" is defined as a person who is related to the named insured by blood, marriage or adoption *and* who is a "resident" of the named insured's household.

As of the date of the accident, mother was divorced from Son's father. Son moved back and forth between his parents' homes as was reflected in his school attendance records. Although Son had a bedroom available at both his mother's house and his father's house, he would typically take whatever few personal belongings he had with him when he would stay with either of them. Approximately three to four weeks before the accident, mother told Son to leave her residence with the intent of terminating Son's status as a member of that household. Immediately after the accident, mother took Son back to live with her for an indefinite period of time. Son subsequently continued to move back and forth between his mother's house and his father's house.

The trial court concluded that the phrases "relative" and "resident" as used in the insurance policy were ambiguous and would accordingly be construed against Erie. It further concluded that Son was both a relative within the meaning of the automobile insurance policy and a resident of mother's

---

1. The Pennsylvania Department of Transportation is a defendant in these underlying civil actions based upon theories of negligence, highway maintenance and design.

household on the date of the accident. As such, Son was entitled to liability coverage under the insurance policy.

The trial court found that Erie had an obligation to defend Son with respect to the civil actions filed against him for the September 9 car accident. The trial court also noted that Erie had the evidentiary burden of obtaining a declaration of non-coverage and that Erie had not met this burden.

■ Erie then filed a motion for post-trial relief. The trial court denied Erie's motion and affirmed its order dated January 29, 1993, which stated that the insurance policy issued by Erie to mother provided coverage to Son for the automobile accident on September 9, 1989. This appeal followed.[2]

■ Erie first contends that the trial court erred in concluding that the terms "relative" and "resident," as used in the insurance policy, were ambiguous. In addition, Erie asserts that the factual circumstances of this case demonstrate that Son was not a resident of his mother's household at the time relevant to determining the applicability of liability insurance coverage. We disagree.

Since Son was not a named insured under his mother's policy, the issue of his entitlement to coverage turns upon whether he is a "relative" of the policyholder. Pursuant to the language of the insurance policy, a "relative" is a "resident" of the insured's household who is related to the insured by blood, marriage or adoption. Neither side has contested the fact that Son is related to mother by blood. Therefore, the determinative issue is whether Son qualifies as a "resident" of mother's household.

■ The trial court concluded that the terms "resident," and thus "relative," were ambiguous and would be construed against Erie. As noted by the trial court, any ambiguity in an

2. In an appeal from a declaratory judgment action, this court's standard of review is limited to determining whether the trial court's findings were supported by substantial evidence, whether the trial court committed an error of law, or whether the trial court abused its discretion. *Apollo–Ridge School District v. Tax Claim Bureau,* 141 Pa.Commonwealth Ct. 111, 595 A.2d 217 (1991).

insurance policy must be construed in favor of the insured. *State Farm Insurance Co. v. Bullock,* 316 Pa.Superior Ct. 475, 463 A.2d 463 (1983). In addition, it is strictly a legal determination as to whether written contract terms are ambiguous. *Metzger v. Clifford Realty Corp.,* 327 Pa.Superior Ct. 377, 476 A.2d 1 (1984).

A contract will be found to be ambiguous if, and only if, it is reasonably or fairly susceptible to different constructions, is capable of being understood in more senses than one, is obscure in meaning through indefiniteness of expression, or has a double meaning. *Young by Young v. Equitable Life Assurance Society of the United States,* 350 Pa.Superior Ct. 247, 504 A.2d 339 (1986). A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction. *Id.* at 252–53, 504 A.2d at 341.

The term "resident" has been defined as meaning one who actually resides in the household of the insured. *Amica Mutual Insurance Co. v. Donegal Mutual Insurance Co.,* 376 Pa.Superior Ct. 109, 545 A.2d 343 (1988). The court in *Amica* observed that the term "resident" amounts to one's factual place of abode. However, this definition still leaves open the question of whether a relative can be a resident of more than one household.

The court in *Amica* noted that although no Pennsylvania appellate decision has yet decided the issue, a child of separated or divorced parents may be regarded as a resident of the households of both parents. *Id.* at 120, 545 A.2d at 348. Such a holding would seem appropriate where the child divides his time between the two. *Id.* In *Miller v. U.S.F. & G. Co.,* 28 Pa.D. & C.3d 389 (1983), the sixteen-year-old son of divorced parents was held to be a resident of both households. The court in *Miller* concluded that the phrase "resident of a household" was ambiguous and that the insurance company

could have further defined it had the company chosen to do so.[3]

In this case, Erie's failure to elaborate on the definitions of "relative" and "resident" created an ambiguity as to whether the policy contemplated coverage to dual residents. Erie did not issue its insurance policy to mother until May 1989, ten months after *Amica* was decided. Since the *Amica* opinion effectively provided notice to insurers of the potential for a determination of dual residency, Erie could have clarified the language in its policy during the interim. Moreover, the record clearly reflects the fact that Son was continuously moving between his mother's home and his father's home. Reproduced Record (R.) at 160a–74a. The trial court's conclusion that the words "relative" and "resident" were ambiguous, as applied to the particular facts of this case, is adequately grounded in both fact and law.

■ Erie further contends that even if the terms "relative" and "resident" are ambiguous, the facts in this case do not lead to the conclusion that Son was a protected person for liability insurance purposes under any definition of those terms. We disagree.

■ Son's status as a resident of his mother's household was supported by substantial evidence in the record. In determining whether substantial evidence exists, this court must review and evaluate the relevant evidence relied upon to determine if a reasonable person would consider it adequate to support the findings. *McDermond v. Foster*, 127 Pa.Commonwealth Ct. 151, 561 A.2d 70 (1989). Where there is conflicting evidence, the conclusions of the trial court judge who heard the conflicting evidence cannot be lightly disturbed. *Morris v. Morris*, 136 Pa.Superior Ct. 167, 7 A.2d 18 (1939).

In this case, the evidence showed that Son had established a pattern of spending significant time at both his mother's house and his father's house. R. at 161a–62a. There was no custody agreement or order mandating his presence in either household for a particular period of time. R. at 160a–61a.

**3.** Although decisions of lower courts are not controlling on this court, we find the reasoning in *Miller* to be persuasive.

Although he divided his time between his parents' homes, Son never stayed with either one for more than six months. R. at 174a. Son's alternating pattern of living arrangements was evident from his school records. R. at 101a–20a. Son testified that he accepted support from whichever parent he was then living with, he did not own any significant property and essentially took only his clothes with him when he moved, he could have received important mail at either residence, and personal bedrooms were available for his use at both homes. R. at 173a–87a.

The trial court found that three to four weeks before the car accident, mother told Son to leave her residence with the intent of terminating his status as a member of that household. In the past, however, Son had moved between homes because of boredom or disagreements with the parent with whom he was then living. R. at 161a. Despite mother having told Son to leave her home, immediately after the accident mother took Son back to live with her for an indefinite period of time. The trial court's finding that Son was a resident of his mother's household was supported by substantial evidence and, accordingly, must be upheld.

 Erie's second argument is that the trial court erred in concluding that Erie had the evidentiary burden of obtaining a declaration of non-coverage. It asserts that since the issue of residency arose in the context of basic policy protection, and not in the context of enforcement of an exclusion or limitation, the burden of proof should not be on Erie.

This court has held that where a burdened party has presented evidence such that it does not lose summarily, the burden of proof is no longer relevant and the fact finder must decide which party prevails based on the weight of the evidence. *Haygood v. Civil Service Commission*, 133 Pa.Commonwealth Ct. 517, 576 A.2d 1184 (1990), *petition for allowance of appeal granted*, 527 Pa. 605, 589 A.2d 694 (1991), *appeal dismissed*, 529 Pa. 447, 605 A.2d 306 (1992). In such a situation, a misallocation of the burden of proof will be considered harmless error. *Id.* Moreover, the Third Circuit Court of Appeals, in a decision applying Pennsylvania law, has noted

that where an insurer seeks a declaration of non-coverage as to a particular accident, the insurance company should be able to produce proof of the facts it asserts. *Liberty Mutual Insurance Co. v. Sweeney*, 216 F.2d 209 (3d Cir.1954).

In this case, the evidence presented by the parties was virtually identical, especially with respect to Son's pattern of residing with both parents and mother's request, three to four weeks prior to the car accident, that Son leave her home. It is clear from the record that the trial court did not summarily dismiss Erie's claims for failure to meet an allegedly improperly imposed burden of proof. Rather, the trial court carefully weighed both parties' claims and evidence and ruled against Erie. Since the court's ultimate decision was based upon substantial cumulative evidence, as it would have been had the burden been reversed, there was no error by the trial court.

Accordingly, the order of the trial court is affirmed.

### ORDER

NOW, this 3rd day of November, 1994, the order of the Court of Common Pleas of Centre County, dated July 19, 1993, at No. 1991–2327, is affirmed.

649 A.2d 740

**Charles W. BIRDSALL and Joan D. Birdsall**

v.

**CARBON COUNTY BOARD OF ASSESSMENT & REVISION OF TAXES and Mahoning Township and Lehighton Area School District.**

**Appeal of Leighton Area School District, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 23, 1994.

Decided Nov. 3, 1994.

Michael S. Greek, for appellant.

Joseph J. Matika, for appellees.

Before DOYLE and FRIEDMAN, JJ., and KELTON, Senior Judge.

FRIEDMAN, Judge.

The Lehighton Area School District (School District) appeals from an order of the Court of Common Pleas of Carbon County (trial court) sustaining the 1992 tax assessment appeal

of Charles W. and Joan Birdsall (Birdsalls).[1] The trial court's order struck the $177,205.00 assessment imposed on the Birdsalls' condominium property by the Carbon County Board of Assessment & Revision of Taxes (Board) and fixed the assessed value of the property at $71,610.00 to reflect the expert testimony presented by the Birdsalls.

The Birdsalls, owners of condominium property located in Mahoning Township (Township), appealed to the trial court seeking to reduce the 1992 tax assessment which the Board had imposed against their property. The Township and School District (collectively, Intervenors) intervened on the side of the Board and participated throughout the proceedings.

The trial court originally scheduled the hearing on the Birdsalls' appeal for May 24, 1993. On that date, prior to beginning the proceeding, the Board presented a Motion in Limine to the trial court seeking to exclude any testimony from the Birdsalls' expert witness appraising the subject property based on its use as a rental apartment complex as opposed to condominiums. (R.R. at 29a–32a.) Counsel for the Birdsalls argued for dismissal of the Board's motion; however, the trial court continued the hearing in order to fully consider the matter raised in the Motion in Limine. Subsequently, the Birdsalls arranged to have their expert reappraise the property to conform to condominium requirements, (R.R. at 58a–59a, 95a), and, on August 18, 1993, a copy of the revised appraisal was received by each of the parties. (R.R. at 133a–35a.) The rescheduled hearing on the Birdsalls' tax assessment appeal took place on August 30, 1993.

Before analyzing the reasoning of the trial court in sustaining the Birdsalls' appeal, we first restate the by now familiar order of proof in tax assessment cases. Our Supreme Court described the procedure in *Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 209 A.2d 397 (1965), as follows:

---

1. We note that Mahoning Township has filed a brief in support of the School District's position.

The proceedings in the trial court are de novo and the proper order of proof in cases such as the present one has long been established. The procedure requires that the taxing authority first present its assessment record into evidence. Such presentation makes out a prima facie case for the validity of the assessment in the sense that it fixes the time when the burden of coming forward with evidence shifts to the taxpayer. If the taxpayer fails to respond with credible, relevant evidence, then the taxing body prevails. But once the taxpayer produces sufficient proof to overcome its initially allotted status, the prima facie significance of the Board's assessment figure has served its procedural purpose, and its value as an evidentiary devise is ended.... [Citations omitted.]

Of course, the taxpayer still carries the burden of persuading the court of the merits of his appeal, but that burden is not increased by the presence of the assessment record in evidence.

Of course, the taxing authority always has the right to rebut the owner's evidence and in such a case the weight to be given to all the evidence is always for the court to determine. The taxing authority cannot, however, rely solely on its assessment record in the face of countervailing evidence unless it is willing to run the risk of having the owner's proof believed by the court. Where the taxpayer's testimony is relevant, credible and unrebutted, it must be given due weight and cannot be ignored by the court. It must necessarily be accepted. [Citations omitted.]

*Id.* at 221–22, 209 A.2d at 402.

Here, at the August 30, 1993 rescheduled hearing, the Chief Assessor for Carbon County, David R. Ratajczak, established a prima facie case for the validity of the Board's assessment by presenting the assessment record into evidence, indicating an assessed property valuation of $177,205.00.[2] The burden

2. Actually, Mr. Ratajczak testified that the total assessed valuation for all condominium units was $151,933.00 which, multiplied by a common-level ratio factor of 11.91, established a fair market value of approximately $1.8 million for the units. In addition, Mr. Ratajczak

then shifted to the Birdsalls, who presented extensive testimony from Christie M. Davies, a state licensed real estate appraiser. Ms. Davies testified that, in her opinion, the assessed value for the Birdsalls' property was actually $71,610.00.[3] The trial court then offered the Board and Intervenors an opportunity to rebut Davies' expert testimony. Both the Board and the Township responded that they had no rebuttal evidence to present, (R.R. at 131a, 132a); however, when asked whether it had any rebuttal, the School District replied:

> Your Honor, the appraisal by Ms. Davies was not supplied to us till about two weeks prior to the hearing. The appraiser retained by the School District has not had an opportunity to review it or comment. We would ask that a continued hearing be scheduled 30 to 60 days from today to give them an adequate opportunity to review.

(R.R. at 132a.) The School District's request for a continuance was joined by the Board and the Township but was opposed by the Birdsalls. After consideration, the trial court denied the School District's request. Then, in its opinion, the trial court credited Ms. Davies' testimony and, because it was not rebutted, accepted that testimony as conclusive. Accordingly, the trial court entered an order decreeing the assessed

stated that the property's common areas were assessed separately at $28,076.00, reflecting a fair market value of $334,000.00. Thus, the property had a total fair market value of approximately $2.1 million and an assessed value of $180,009.00. (R.R. at 42a–44a.) We note, however, that these amounts differ slightly from those recited in the trial court opinion. According to that opinion, the condominium units had an assessed valuation of $149,129.00 and the separate portion of the real estate was assessed at $28,076.00, for a combined assessment of $177,205.00. The trial court then applied a common level ratio of 7.7, reflecting a fair market value for assessment purposes of $2,301,363.00 for the subject property. (R.R. at 4a–5a; Trial court op. at 2–3.) This inconsistency does not affect the disposition of this case.

3. Ms. Davies based this amount on her estimated fair market value for the property of under $1 million. Ms. Davies testified that she derived a value of $875,000.00 for the condominium units and a value of $55,000.00 for the 5.68 acres of "withdrawable and convertible excess land," for a combined valuation of $930,000.00. (R.R. at 80a.) Ms. Davies then explained in detail how she arrived at these figures by utilizing both an income and a field comparison or market approach. (R.R. at 81a–93a.)

value of the Birdsalls' condominium property to be $71,610.00. The School District filed a Petition for Reconsideration which the trial court denied. In a supplemental opinion, the trial court supported its denial of the School District's original request for a continuance and its denial of the School District's Petition for Reconsideration.

On appeal to this court,[4] the School District does not contend that the Birdsalls, through their expert witness, presented testimony that was insufficient in the first instance to overcome the Board's prima facie case. In fact, the School District agrees that if the Board and Intervenors had simply rested on the assessment record to support their position, the trial court's determination would have been correct. However, the School District argues that because a taxing authority *always* has the right to rebut the property owner's evidence, the trial court here erred or abused its discretion by denying the School District's request for a continuance to allow presentation of expert rebuttal testimony; instead, basing its valuation of the property in question entirely upon the Birdsalls' expert evidence.

At its core, the School District's argument is simply that through no fault of its own, it did not anticipate the need to rebut the Birdsalls' appraisal evidence with expert testimony. The School District reasons that at the first hearing on May 24, 1993, the Birdsalls indicated that they intended to offer evidence of the appraised value of the property *as a rental apartment complex;* evidence that would not have required presentation of expert rebuttal testimony but would have necessitated only a showing that the property was used for condominiums. Although the need for rebuttal evidence became apparent after the Birdsalls arranged for a revised appraisal setting forth the value of the property *as condominiums,* the School District maintains that because of the unex-

4. Our scope of review in a tax assessment appeal is limited; the findings of the court below must be given great force and will not be disturbed unless clear error appears or there is an abuse of discretion or lack of supporting evidence. *Appeal of Chartiers Valley School District,* 67 Pa.Commonwealth Ct. 121, 447 A.2d 317 (1982), *appeal dismissed,* 500 Pa. 341, 456 A.2d 986 (1983).

pected and untimely receipt of this new information, it was unable to prepare a proper rebuttal in time for the August 30, 1993 hearing.[5] Accordingly, the School District asserts that a just and proper determination of the action required a continuance, and in failing to grant one, the trial court erred and abused its discretion by depriving the School District of the opportunity and right to meet its required burden of proof. We must disagree.

The grant or refusal of a request for a continuance is within the discretion of the trial court and only where such discretion has been abused will the refusal of a continuance be reversed. *Phoenix Mutual Life Insurance Co. v. Radcliffe on the Delaware, Inc.*, 439 Pa. 159, 266 A.2d 698 (1970). Four factors are used to determine whether a continuance was properly denied: (1) whether the delay prejudiced the opposing party; (2) whether opposing counsel was willing to continue the case; (3) the length of the delay requested; and (4) the complexities involved in presenting the case. *Snyder v. Port Authority of Allegheny County*, 259 Pa.Superior Ct. 448, 393 A.2d 911 (1978). The School District contends that, based on these factors, the trial court should have granted the request for a continuance.

The School District claims that while it would be prevented from presenting evidence required to meet its burden of proof, the Birdsalls, having already paid their 1992–93 taxes, would not be unduly prejudiced by any delay. Further, the School District contends that the delay would not be significant because the School District already had an appraiser engaged at the time of the continuance request. Finally, the School District asserts that the complexities involved in presenting this case warranted the grant of a continuance, particularly in light of the great disparity between the Board's appraisal and that provided by the Birdsalls' expert.

Beyond these four factors, the School District also repeats its assertion that, through no fault of its own, it was taken by

5. Apparently, the School District's expert witness was on vacation and, thus, unavailable at the time the revised appraisal was received. (R.R. at 135a.)

surprise by the revised appraisal and, therefore should have been afforded an opportunity to prepare to meet the new and unanticipated situation. Additionally, the School District maintains that the trial court should have granted the continuance on the grounds of absence of a material witness because, here, the expected testimony of the School District's expert rebuttal witness would not have been cumulative or merely impeaching but would have provided competent, material evidence necessary for the taxing authority to meet its burden of proof. *Barner v. Juniata County Tax Claim Bureau*, 104 Pa.Commonwealth Ct. 468, 522 A.2d 169 (1987), *appeal denied*, 515 Pa. 624, 531 A.2d 432 (1987).

Assuming, without conceding,[6] the merit of all the School District's arguments, we note that while they may provide the School District with grounds for a continuance, these arguments cannot be used as support for the grant of the School District's request for a continuance where that request was untimely. That is the case here.

The School District makes much of the fact that the Birdsalls' revised appraisal came as a complete surprise, providing no opportunity for the School District to review or rebut that evidence.[7] However, the School District became aware of its

**6.** In this regard, we note that the trial court did not accept the School District's arguments. In fact, the trial court reviewed the four factors set forth in *Snyder* and concluded that the dispute between the parties was not in any sense complex; that the Board and Intervenors had months in which to conduct an independent investigation and offered no extenuating circumstances which prevented them from presenting rebuttal testimony at trial. Moreover, the trial court determined that while the School District made no showing of prejudice, the Birdsalls would be prejudiced by having to delay the case because of the unpreparedness of their opponents. Finally, the trial court noted that the School District did not indicate that a continuance would actually produce rebuttal evidence; rather, the School District requested a continuance to permit its expert to "review" the Birdsalls' appraisal for "comment." (R.R. at 132a.)

**7.** In light of the Board's Motion in Limine seeking to limit appraisal testimony to that based on the property's use as a condominium complex, neither the Board nor Intervenors can claim prejudice or surprise when the Birdsalls revised their appraisal to comply with this proposed limitation. Indeed, they could have anticipated and prepared for this eventuality.

need for rebuttal evidence as soon as it received the new appraisal on August 18, 1993, almost two weeks prior to the August 30, 1993 hearing. If the School District felt prejudiced by its insufficient notice of the Birdsalls' revised appraisal, particularly where its appraiser was temporarily unavailable, the School District could have requested a continuance when it first learned of the revised appraisal or at any time prior to the hearing. Instead, the School District waited until August 30, the date of the hearing itself, to make its request and, even then, requested the continuance only after the Birdsalls had presented their entire case.[8] Given the untimely nature of the School District's request for a continuance, we cannot say that the trial court abused its discretion by denying that request and deciding the case on the evidence before it. *See* Pa.R.C.P. No. 216(c); 7 Standard Pennsylvania Practice 2d § 38:50 (1982 & Supp.1994); *Feingold v. Southeastern Pennsylvania Transportation Authority*, 339 Pa.Superior Ct. 15, 488 A.2d 284 (1985), *aff'd*, 512 Pa. 567, 517 A.2d 1270 (1986).

Accordingly, because the Birdsalls came forward with sufficient credible proof to overcome the Board's prima facie case, and neither the Board nor the Intervenors offered rebuttal evidence, the trial court had no alternative but to sustain the Birdsalls' appeal, and we affirm its order doing so.

## ORDER

AND NOW, this 3rd day of November, 1994, the order of the Court of Common Pleas of Carbon County, dated November 16, 1993, is hereby affirmed.

---

**8.** We note that upon questioning by the court during argument, counsel for the Birdsalls indicated that the practice in the Court of Common Pleas of Carbon County is to permit a motion for a continuance to be presented, and thus considered timely, even on the day of the actual hearing as long as the request is made before the start of the proceedings.

650 A.2d 1097

**Lukisha CARROLL, a minor, by her Parent and
Natural Guardian Phyllis BURBANK and
Phyllis Burbank in her own right**

v.

**PHILADELPHIA HOUSING AUTHORITY
and General Elevator Company.**

**Appeal of Phyllis BURBANK, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Oct. 4, 1994.

Decided Nov. 4, 1994.

276

Leonard Schaeffer, for appellant.

James F. Ryan, for appellee, Philadelphia Housing Authority.

Before PELLEGRINI and KELLEY, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

Phyllis Burbank (Burbank) appeals from the December 13, 1993 order of the Court of Common Pleas of Philadelphia County, granting summary judgment in favor of Philadelphia Housing Authority (PHA) in an action in which Burbank, suing in her own right, seeks to recover from PHA the future medical expenses of her injured daughter.

The issue before us is whether the trial court erred in determining that Burbank has no right to recovery because the alleged damages are too speculative. We reverse.

## Background

The undisputed facts of this case, as recited by the trial court, are as follows. On January 9, 1988, Burbank's minor daughter, Lukisha Carroll, then 13, fell twelve stories into an elevator shaft when the elevator door that she leaned against opened. She was seriously and permanently injured and is presently in a vegetative state from which she will not recover. Burbank brought suit in negligence on her own behalf and on behalf of her daughter against PHA and the General Elevator Company.

In 1991, Burbank reached a structured settlement with the elevator company. The terms of the settlement provided for an immediate cash payment to the minor in the amount of $337,600.00. Additionally, the elevator company agreed to pay to the minor $37,600.00 compounded annually at 4% for her maintenance and support for the remainder of her life. Based on the minor's life expectancy, the court determined that the structured settlement could be worth $11,090,811.00. Under the settlement, Burbank also receives $200 per month for a minimum of 30 years, anticipated to total $122,800.00.

In July 1993, Burbank reached a settlement agreement with PHA on behalf of her daughter for $250,000.00, the maximum amount payable pursuant to 42 Pa.C.S. § 8522 and § 8528(b) (relating to limitations on damages).[1]

Prior to the settlements, the Department of Public Welfare (DPW) assumed payment of all of the minor's medical bills. As of January 1, 1994, DPW ceased payment. By agreement with Burbank, the settlement funds have been reduced to satisfy DPW's lien for past medical bills.

In this action, Burbank seeks recovery on her own behalf from PHA for future medical costs. Burbank contends that she may become liable for excess medical bills, not covered by the settlement agreements, arising from the maintenance and support of her daughter.

The trial court determined that, although Burbank may be liable to support her daughter even after she reaches her majority, "that obligation is so contingent and remote in this case that it precludes [Burbank's] recovery." (Trial Court's December 13, 1993 opinion at 3.) The court reasoned that, in order for Burbank to become liable for any additional support, among other unspecified contingencies, the settlement amount would have to be insufficient, the health provider would have to seek payment from another source, and because, in that case, DPW "would most probably assume the payment of the difference," DPW would then have to seek recovery against Burbank. (Trial Court's December 13, 1993 opinion at 3.) The trial court, concluding that Burbank had no enforceable right in view of these contingencies, granted summary judgment in favor of PHA.

On appeal to this Court, citing *Verna v. Verna,* 288 Pa.Superior Ct. 511, 432 A.2d 630 (1981), and *Brower v. City of Philadelphia,* 124 Pa.Commonwealth Ct. 586, 557 A.2d 48

1. The Limitations on Damages section provides:
 **Amount Recoverable**—Damages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $250,000 in favor of any plaintiff, or $1,000,000 in the aggregate.
 42 Pa.C.S. § 8528(b).

(1989), *petition for allowance of appeal denied,* 525 Pa. 604, 575 A.2d 569 (1990), Burbank argues that she has the right to claim for future medical expenses during the total incompetency of her daughter. Burbank contends that PHA is precluded from benefitting from the settled claim of her daughter under the collateral source rule. With respect to the court's determination that Burbank's claims are too remote and speculative, Burbank argues that there is an issue of fact as to the adequacy of the funds provided in the settlement agreement and that such an issue precludes the entry of a summary judgment. Additionally, Burbank argues that the trial court's assumption that the medical provider would first seek payment from DPW, as opposed to Burbank, raises a mixed question of fact and law.

PHA argues that Burbank has no legally ascertainable and cognizable basis for her claim for future medical expenses. Citing *Deleski v. Raymark Industries,* 819 F.2d 377 (3d Cir.1987), disallowing compensation for the risk of the development of a disease, PHA argues that a plaintiff may not recover for the mere possibility of future harm. Additionally, PHA, citing *Brower,* contends that, because Burbank has not paid her daughter's medical expenses during her minority, Burbank's obligation and, thus, her claim will cease at the daughter's majority.

### Discussion

 Our scope of review of an order granting a motion for summary judgment is limited to determining whether the trial court committed an error of law or a manifest abuse of discretion. *Mullen v. Borough of Parkesburg,* 132 Pa.Commonwealth Ct. 321, 572 A.2d 859 (1990). A trial court may properly enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.C.P. No. 1035; *Samarin v. GAF Corp.,* 391 Pa.Superior Ct. 340, 571 A.2d 398 (1989). The trial court must review the record in the light most favorable to the non-moving party; any doubt

must be resolved against the moving party. *Id.* Thus, the question before us is not whether Burbank is entitled to recovery, but whether the trial court erred in denying her the opportunity to present her claim to a trier of fact.[2]

As recognized by the trial court, a jury may not award damages on the basis of speculation or conjecture. *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985). Damages are speculative if the uncertainty concerns the fact of damages not the amount. *See Pashak v. Barish*, 303 Pa.Superior Ct. 559, 450 A.2d 67 (1982). Even in cases in which the question is one of future medical prognosis, a claim will be sustained where the plaintiff presents "competent evidence from which the jury can reasonably determine the degree to which future consequences of a present injury are probable, and accordingly, what the amount of any damages award should be." *Martin,* 508 Pa. at 165, n. 5, 494 A.2d at 1094, n. 5. Where the amount of damages is difficult to calculate with absolute precision, the indefiniteness does not preclude relief; rather, a claim for damages may be sustained if the amount may be fairly estimated from the evidence. *See Martin; Aiken Industries, Inc. v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808 (1978). Therefore, summary judgment is improperly granted solely on the basis that the amount of damages is indefinite. *See Thorsen v. Iron & Glass Bank*, 328 Pa.Superior Ct. 135, 476 A.2d 928 (1984).

In the case before us, there is no question as to the fact of damages: Lukisha Carroll requires continuous medical care. Burbank is legally responsible for her daughter's support. *Verna v. Verna*, 288 Pa.Superior Ct. 511, 432 A.2d 630 (1981) (parents' duty to support adult child continues where child physically or mentally feeble or otherwise unemployable); *Brower v. City of Philadelphia*, 124 Pa.Commonwealth Ct. 586, 557 A.2d 48 (1989) (injury to minor gives rise to cause of action to parents for minor's medical expenses). The uncertainty in this case concerns the question of whether the

2. Because neither party raised the issue, we do not discuss whether the parent's claim for the minor child's medical expenses is derivative and would therefore be foreclosed following the minor's settlements.

amount provided in the settlement agreements for Lukisha Carroll's maintenance and support will be sufficient.[3]

We turn, therefore, to the record to determine whether PHA has properly supported its motion for summary judgment with respect to the sufficiency of the settlement funds. Our examination of the record reveals that PHA has failed to show, by any supporting documentation, that no factual issue remains with respect to the sufficiency of the sums provided by the settlement agreements. We conclude, therefore, on this record, that PHA has failed to demonstrate a clear right to relief. Accordingly, we reverse the trial court's grant of summary judgment.

## ORDER

AND NOW, this 4th day of November, 1994, the order of the Court of Common Pleas of Philadelphia County dated December 13, 1993 granting summary judgment in favor of Philadelphia Housing Authority is hereby reversed.

650 A.2d 1101

CAROLINA FREIGHT CARRIERS CORPORATION, Petitioner,

v.

UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Submitted Aug. 19, 1994.

Decided Nov. 4, 1994.

---

3. We note, here, our agreement with the trial court that the collateral source rule, which is intended to avoid precluding a claimant from obtaining redress from a wrongdoer merely because coverage for the claimant's injuries is provided by a collateral source, by definition, is not applicable to the case at bar. *See Beechwoods Flying Service, Inc. v. Al Hamilton Contracting Corp.*, 504 Pa. 618, 476 A.2d 350 (1984).

282

Christopher A. Weals and Daniel Marino, for petitioner.

Ronald T. Tomasko, for intervenor William E. Hewitt.

Before PELLEGRINI and FRIEDMAN, JJ., and DELLA PORTA, Senior Judge.

FRIEDMAN, Judge.

Carolina Freight Carriers Corporation (Employer) appeals from an order of the Unemployment Compensation Board of Review (Board) which vacated the referee's decision[1] and granted benefits to William E. Hewitt (Claimant).[2] We affirm.

After being laid off by Employer, Claimant applied for and received unemployment compensation benefits. The Carlisle Job Center (job center) subsequently determined that Claimant had been overpaid benefits for the weeks ending January 2, January 9 and January 16, 1993 because he had failed to work on four days during those weeks when work was available. Claimant appealed this determination on July 13, 1993, contending that he had not learned of the determination until

---

1. The referee had dismissed Claimant's appeal from the Carlisle Job Center's Notice of Determination on the grounds that Claimant's appeal was untimely filed.

2. The Board also determined that any prior overpayment was not the fault of Claimant and would, therefore, be subject to recoupment from future compensation. This portion of the Board's order is not challenged on appeal.

July 9, 1993, when he telephoned the job center to inquire about the status of his case. (R.R. at 23a.) However, following a hearing, the referee found that the original Notice of Determination (Notice) [3] had been mailed to Claimant and had not been returned by the post office as undeliverable. (Referee's Finding of Fact, No. 2.) The Notice listed June 23, 1993 as the last day on which an appeal could be filed. Therefore, the referee dismissed Claimant's appeal as having been untimely filed.

On appeal, the Board disagreed with the referee and made the following findings of fact.

1. For purposes of this appeal, during the weeks at issue, claimant was employed by Carolina Freight Carriers on intermittent lay off status, subject to call from the casual board.[4]

2. In accordance with employer's rules, claimant was subject to calls twenty four hours per day, seven days per week.

3. During claim week ending January 2, 1993, the claimant had no actual earnings and received holiday pay in the amount of $167.20.

4. During claim week ending January 9, 1993, the claimant had no actual earnings.

5. During claim week ending January 16, 1993, the claimant had no actual earnings.

6. In addition to the actual work, as indicated above, employer alleges that work was available for claimant on January 2, January 3, January 4, January 10, and January 11, 1993.

3. The job center apparently prepared three separate sheets. Two were entitled "Notice of Determination (Earnings)," one dealing with earnings for the weeks ending January 9 and January 16, 1993 and the other dealing with earnings for the week ending January 2, 1993. The third sheet was titled "Notice of Determination Overpayment of Benefit (Fault or nonfault)." For purposes of this case, these separate sheets are referred to as if they were a single Notice.

4. The testimony establishes that Claimant voluntarily elected this status; he could have opted for a total lay off on which he would not have been called at all. (R.R. at 19a.)

7. On two of the above dates, the claimant was physically unable to perform his duties due to fatigue and on the remaining three occasions, he was not contacted and was not aware that work was available.

8. The claimant's weekly benefit rate is $304 and his partial benefit credit is $122.

9. The claimant was not sent and he never received the Bureau determination issued on June 8, 1993.

10. The claimant's appeal from these determinations are [sic] deemed to be timely filed.

(Board's Findings of Fact, Nos. 1–10.) Based upon these findings, the Board vacated the decision of the referee and addressed the merits of the appeal, concluding that Claimant was entitled to partial benefits for the week ending January 2, 1993 and to full benefits for the weeks ending January 9 and January 16, 1993.

Employer appeals,[5] arguing that the Board erred (1) in vacating the referee's decision dismissing Claimant's appeal as untimely filed and (2) in granting Claimant full benefits for the weeks ending January 9, 1993 and January 16, 1993.[6]

With regard to the timeliness of Claimant's appeal, Section 501(e) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 821(e), provides, in pertinent part, that a party must file an appeal within 15 calendar days after a Notice is personally delivered to him or mailed to his last known postal address. Employer, relying on the referee's finding of fact, contends that because Claimant received a

---

5. Our scope of review is limited to determining whether the Board's findings are supported by substantial evidence, whether the Board committed an error of law or whether constitutional rights have been violated. *United States Postal Service v. Unemployment Compensation Board of Review,* 152 Pa.Commonwealth Ct. 603, 620 A.2d 572, *reargument denied* (1993).

6. Employer does not challenge the Board's decision with regard to the week ending January 2, 1993.

copy of the Notice more than fifteen days before July 13, 1993 section 501(e) bars Claimant's appeal.[7]

■ Here, however, the Board, which is the ultimate factfinder in unemployment compensation cases, *Hercules, Inc. v. Unemployment Compensation Board of Review*, 146 Pa.Commonwealth Ct. 77, 604 A.2d 1159 (1992), specifically found that the Notice had not been sent and was never received by Claimant. (Board's Finding of Fact, No. 9.) Thus, section 501(e) does not bar Claimant's appeal unless the Board's finding was in error or not supported by substantial evidence. Relying on *Treon v. Unemployment Compensation Board of Review*, 499 Pa. 455, 453 A.2d 960 (1982) and *Hercules*, Employer contends that the Board erred in making Finding of Fact No. 9 because the Board reversed the referee's finding without providing reasons for its reversal. However, the rules expressed in *Treon* and *Hercules* do not apply here.

In *Treon*, our Supreme Court held that where only one party has testified before the referee, the Board must give reasons for reversing a referee's finding which is consistent with that party's uncontroverted testimony. Because both parties testified before the referee in this case, *Treon* does not help Employer. Similarly, the rule expressed in *Hercules* is not applicable to this case. In *Hercules* we said:

7. Employer misstates the referee's finding. What the referee actually found was that a copy of the Notice of Determination "was mailed to [C]laimant at his last known post office address furnished to the local office, and said decision was not returned by the postal authorities as being undeliverable." (Referee's Findings of Fact, No. 2.) However, even as stated, the referee's finding would have supported the Employer's argument that Claimant's appeal was untimely under section 501(e) of the Law, 43 P.S. § 821(e) because, in interpreting section 501(e), our courts have applied a presumption that notice mailed to Claimant's last known address and not returned by the postal authorities as undeliverable has been received. *Mihelic v. Unemployment Compensation Board of Review*, 41 Pa.Commonwealth Ct. 546, 399 A.2d 825 (1979). Here, however, that presumption is not applicable because the record contains no testimony to show that the Notice was sent or that it would have been mailed in the regular course of business, and the Board specifically found that the Notice had not been sent.

> Where there exists overwhelming, uncontroverted evidence upon which the referee relies to make findings, and where the Board takes no additional evidence, the Board may not disregard (or make findings contrary to) such findings of the referee unless it provides reasons for doing so, Treon, or those reasons are clear from the record.

*Hercules,* 146 Pa.Commonwealth Ct. at 85, 604 A.2d at 1163. Here, the record does not contain "overwhelming, uncontroverted" evidence to support the referee's finding that the Notice of Determination was mailed to Claimant. Accordingly, the Board did not err in reversing the referee's finding of fact and determining that the Notice had never been sent to Claimant.

■■■ Employer contends that Claimant's claim of non-receipt of the Notice does not justify his untimely appeal. We disagree. In making this argument, Employer presumes that the Notice was sent to Claimant. As we have discussed, the Board found that the Notice was never sent. Thus, although Employer does not specifically say so, it is in effect arguing that substantial evidence does not support the Board's finding. Substantial evidence is such relevant evidence as a reasonable mind might find acceptable to support a conclusion. *Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 501 A.2d 1383 (1985). On appeal, we must determine whether the record, taken as a whole, supports the findings of the Board, *id.,* giving the party which prevailed before the Board the benefit of all logical and reasonable inferences which can be drawn from the evidence. *Miller v. Unemployment Compensation Board of Review,* 45 Pa.Commonwealth Ct. 539, 405 A.2d 1034 (1979).

■ Here, Employer presents no evidence to show that the Notice was sent. Together with Claimant's testimony that the Notice was never received, this lack of evidence is sufficient to support the Board's finding that the Notice was never sent. Thus, we must accept the Board's finding as conclusive. *Hercules.* Given this finding, the Board properly accepted Claimant's *nunc pro tunc* appeal. See *U.S. Postal Service v. Unemployment Compensation Board of Review,* 152 Pa.Com-

monwealth Ct. 603, 620 A.2d 572, *reh'g denied,* 152 Pa.Commonwealth Ct. 603, 620 A.2d 572 (1993).[8]

■ However, even without the finding that the Notice was never sent to Claimant, the fact that Claimant did not receive the Notice could justify an untimely appeal. For instance, in *Walker v. Unemployment Compensation Board of Review,* 75 Pa.Commonwealth Ct. 116, 461 A.2d 346 (1983), where a claimant testified that the postal service had failed to forward his mail to another address as he had requested, we stated that "[a]n untimely appeal may be allowed where the untimeliness is not the result of the negligence of the appellant." *Id.* at 117, 461 A.2d at 347.[9]

8. In *United States Postal Service,* we permitted a *nunc pro tunc* appeal because the referee's decision was never mailed to the last known postal address of the employer's advocate. 34 Pa.Code § 101.89 requires that a copy of the notice be sent to a party's counsel or authorized agent.

9. Our court has continued to address the question of when *nunc pro tunc* appeals should be allowed in unemployment compensation cases. In *Cook v. Unemployment Compensation Board of Review,* 163 Pa.Commonwealth Ct. 583, 641 A.2d 692 (1994), we recently discussed the instances when these appeals have been permitted, stating:

Generally, an appeal nunc pro tunc may be allowed when a delay in filing an appeal is caused by extraordinary circumstances involving fraud or some breakdown in a court's operations. In *Bass v. Commonwealth,* 485 Pa. 256, 401 A.2d 1133 (1979), however, our Supreme Court liberalized that rule to the extent that the non-negligent conduct of an appellant's attorney which results in an untimely appeal may provide grounds which would permit an appellant to appeal nunc pro tunc. The extent of the liberalization of that rule in the wake of Bass was explained in *Finney v. Unemployment Compensation Board of Review,* 81 Pa.Commonwealth Ct. 101, 472 A.2d 752 (1984), as follows:

Now, non-negligent conduct of the appellant's attorney, which results in an untimely appeal, may also suffice for the grant of an appeal nunc pro tunc. .... *[I]t has also been held that, where the appellant himself has not been negligent, negligent acts by a third party not part of the litigation process will also excuse an untimely filing and permit an appeal to be taken nunc pro tunc.*
*Id.* at 103–04 n. 3, 472 A.2d at 753 n. 3.
*Cook,* 163 Pa.Commonwealth Ct. at 585, 641 A.2d at 693 (citations omitted) (emphasis in original omitted) (emphasis added). In *Cook,* we rejected the claimant's contention that he had provided an adequate excuse for his failure to file an untimely appeal because he had been in a hospital's critical care unit during a portion of the appeal period and

Our review of the statute and the case law convinces us that the 15 day appeal period does not begin to run until notice is either personally delivered to a party or until it is mailed to his or her last known postal address. Because the Board found that the Notice was not sent and was never received by Claimant, the Board properly deemed Claimant's appeal to be timely filed.

■■■■■ As to the Board's decision on the merits, Employer contends that the Board erred in ruling that Claimant had good cause for refusing available work on January 3, 4, 10 and 11 and, thus, that Claimant is entitled to only partial unemployment compensation benefits for the weeks ending January 9 and January 16, 1993. Section 402(a) of the Law provides, in pertinent part, that a claimant is ineligible for compensation for any week in which his unemployment is due to his failure, without good cause, to accept suitable work.[10] 43 P.S. § 802(a). Whether a claimant has good cause for refusing suitable part-time employment is a question of law, subject to our review. *Rising v. Unemployment Compensation Board of Review*, 153 Pa.Commonwealth Ct. 481, 621 A.2d 1152 (1993). A claimant bears the burden of proving that he had good cause for refusing to accept suitable work, and his reasons for refusing suitable work must be real and substantial. *Id.*

■■■■■ Here, Employer claims that Claimant did not have good cause for failing to accept truck driving assignments on four occasions when he was either fatigued or did not receive the information that work was available. The testimony establishes that Claimant refused the assignment on January 4

had not been released from the hospital until one day after the appeal period had expired, stating that "circumstances involving action or inaction on the part of the litigant himself will not provide an 'adequate excuse' [for failure to file an appeal within the 15 day appeal period]." *Id.* at 588, 641 A.2d at 694. *Cook* refines the exception stated in *Walker*.

10. Refusal of an unemployed claimant to accept suitable part-time work may result in partial loss of benefits. *Department of Labor and Industry v. Unemployment Compensation Board of Review*, 113 Pa.Commonwealth Ct. 169, 537 A.2d 50 (1988).

because he was tired and did not feel that it would be safe to drive.[11] (R.R. at 12a and 18a.) The testimony also establishes that a driver is not required to, and is not supposed to, drive when fatigued. (R.R. at 12a, 16a and 19a.) Thus, under the circumstances, being fatigued is good cause for not accepting the truck driving assignment. The testimony also establishes that Employer was unable to reach Claimant on January 3, January 10 and January 11. (R.R. at 18a and 19a.) Claimant could not accept an assignment about which he was not aware. Thus, Employer's inability to apprise Claimant of the available work at these times constitutes good cause for Claimant's failure to accept such work. Under the facts of this case, we determine that good cause did exist for Claimant's failure to accept truck driving assignments on January 3, 4, 10 and 11, 1993, and we agree with the Board that Claimant is entitled to full unemployment compensation benefits for the weeks ending January 9, 1993 and January 16, 1993.

Accordingly, we affirm.

## ORDER

AND NOW, this 4th day of November, 1994, the order of the Unemployment Compensation Board of Review, dated January 31, 1994, is affirmed.

PELLEGRINI, J., concurs in the result only.

---

11. In his appeal Claimant elaborated on why he was too tired to drive, stating that he was tired because he had been out all day looking for jobs. (R.R. at 23a.)

650 A.2d 1106

**TAPCO, INC., Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD
OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Aug. 26, 1994.

Decided Nov. 4, 1994.

David S. Bloom, for petitioner.

James K. Bradley, Asst. Counsel and Clifford F. Blaze, Deputy Chief Counsel, for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., and RODGERS, Senior Judge.

FRIEDMAN, Judge.

Tapco, Inc. (Employer) appeals from an order of the Unemployment Compensation Board of Review (Board) which granted benefits to Peter P. Rudyk (Claimant). We affirm.

Claimant sought unemployment compensation benefits, claiming that Employer had fired him. Employer, on the other hand, contended that Claimant had quit to take care of his children while his wife was in another city for job training and that full-time work was available for Claimant. The Indiana Job Center (job center), crediting Employer, denied benefits. Claimant appealed. Following a telephone hearing during which both parties testified, the referee issued a decision denying benefits to Claimant. The referee's decision, notifying Claimant that he had fifteen days after mailing in which to appeal, identified the decision mailing date as October 14, 1993. (R.R. at 45a.) Claimant appealed to the Board on October 29, 1993. (R.R. at 53a.) The Board remanded to

the referee for additional testimony so that the Board would have complete information regarding all matters at issue for its consideration. Following the second hearing, the Board resolved conflicts in the testimony and issues of credibility in favor of Claimant and concluded that Claimant, who had requested a regular work schedule so that he could hire babysitters while his wife was out of town, had not quit his job with Employer but was discharged by Employer. (Board's Findings of Fact, Nos. 6–12.) The Board concluded that Claimant was entitled to benefits.

Employer appeals,[1] contending that: (1) Claimant's appeal from the referee's decision was untimely filed, and (2) the Board's decision is not supported by the evidence.

Employer contends that Claimant's appeal from the October 14, 1993 referee's decision was filed on the sixteenth day after the referee's decision and was, therefore, filed one day late.[2] We disagree. Employer miscalculates the appeal period, ignoring section 3 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1908 concerning computation of time, which provides:

1. Our scope of review is limited to determining whether constitutional rights have been violated, an error of law has been committed or whether findings of fact are supported by substantial evidence. *Frigm v. Unemployment Compensation Board of Review*, 164 Pa.Commonwealth Ct. 282, 642 A.2d 629 (1994).

2. Section 502 of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 822, which governs the appeal period, provides:

Where an appeal from the determination or revised determination, as the case may be, of the department is taken, a referee shall, after affording the parties and the department reasonable opportunity for a fair hearing, affirm, modify, or reverse such findings of fact and the determination or revised determination, as the case may be, of the department as to him shall appear just and proper. The parties and the department shall be duly notified of the referee's decision, and the reasons therefor, which shall be deemed the final decision of the board, unless an appeal is filed therefrom, within fifteen days after the date of such decision the board acts on its own motion, to review the decision of the referee. A memorandum of testimony of any hearing before any referee shall be made and be preserved for a period of ninety days following expiration of the period for filing an appeal from the final decision rendered in the case.

When any period of time is referred to in any statute, such period in all cases, except as otherwise provided in section 1909 of this title (relating to publication for successive weeks) and section 1910 of this title (relating to computation of months) shall be so computed as to exclude the first and include the last day of such period. Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation.

Pursuant to this statute, October 29, 1993, the day on which Claimant filed his appeal, is within 15 days after the date of the referee's decision. Therefore, Claimant's appeal was timely and was properly entertained by the Board.

As to the merits, Employer contends that Claimant was not fired but, rather, was not available for suitable work while his wife was out of town for her training and challenges the Board's findings to the contrary. Specifically, Employer challenges Finding of Fact, No. 8 and also appears to challenge Findings of Fact, Nos. 12 and 13. Finding of Fact, No. 8 states:

8. Claimant could have worked either daytime hours or night hours so long as there was a regular schedule to count on since baby sitters had been lined up for either daytime or night time.

Findings of Fact, Nos. 12 and 13 state:

12. On or about August 4, 1993, when the time was approaching for claimant's wife to begin her training, claimant again approached the employer for an answer to his request about hours and was told that the employer would have to let him go.

13. The claimant did not voluntarily quit his job but was only awaiting a response to his request for a reduction in hours with a regular shift at the time he was let go.

In making these findings of fact, the Board credited Claimant's testimony, pertinent portions of which follow:

C Well, what happened was that my wife got a job, and I approached Stan about this and told him that the babysitting.... that was no problem for either one of us finding babysitting, you know, for our children.

. . . .

C .... and when I approached Stan about it, he was like, well, we'll work through it, don't worry about it.... And he just kept telling everything is going to be okay.... Well, I approached him a week before this was going to take place that my wife was going to be gone ... and he said the same thing, that everything is okay.... I came in on Wednesday, I believe it was a Wednesday, and he said, well, we're—you know, I asked him about, and he said, well, we're no longer needing—his exact words were we're going to have to let you go, and that was it....

R Well, you said you had restrictions because of childcare. Well, tell me when you could have worked or when you couldn't have worked.

C Regular daylight hours would've been nice, like, 8:00 to 4:30. Something that was steady....

(R.R. at 32a, 33a.)

R ... if the employer would have said to you you can work 8:00–4:30 every day with no overtime, would there have been arrangements if you had child care?

C Yes.

R And what were those arrangements?

C I had a baby sitter—two baby sitters. One was to come to my home, and one was for regular hours. I had to take him to her home. If I was going to work some kind of hours like at night shift or something, I had one girl set up, and if I was going to end up working daylight hours, I had another girl set up.

(R.R. at 69a.)

██ The Board's findings are conclusive on review if they are supported by substantial evidence, which is such evidence as a reasonable mind might find adequate to support a conclusion. *Peak v. Unemployment Compensation Board of Re-*

*view,* 509 Pa. 267, 501 A.2d 1383 (1985). Pursuant to this standard, we must determine whether substantial evidence in the record, taken as a whole, supports the findings of the Board. *Id.* As the ultimate factfinder, the Board determines the credibility of witnesses and the weight to be assigned to the evidence. *Miller v. Unemployment Compensation Board of Review,* 45 Pa.Commonwealth Ct. 539, 405 A.2d 1034 (1979). Here, the Board expressly resolved conflicts in the testimony and issues of credibility in favor of Claimant. Because this is the Board's function, on review, we must afford the party prevailing before the Board the benefit of all logical and reasonable inferences which can be drawn from the evidence. *Id.* The fact that Employer may have produced witnesses who gave a different version of the events, or that Employer might view the testimony differently than the Board, is not grounds for reversal if substantial evidence supports the Board's findings.

Our review of the record as a whole, particularly the testimony quoted herein, convinces us that substantial evidence supports the Board's findings and that the Board's conclusions are consistent with those findings.

Accordingly, we affirm.

### ORDER

AND NOW, this 4th day of November, 1994, the order of the Unemployment Compensation Board of Review dated March 1, 1994, is affirmed.

298

650 A.2d 1109

Delores M. STRIKER, Petitioner,

v.

**WORKMEN'S COMPENSATION APPEAL
BOARD (CALIFORNIA UNIVERSITY
OF PA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Sept. 2, 1994.

Decided Nov. 4, 1994.

Eric P. Betzner, for petitioner.

William C. King, Jr., for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., and DELLA PORTA, Senior Judge.

DELLA PORTA, Senior Judge.

Delores M. Striker (Claimant) appeals from an order of the Workmen's Compensation Appeal Board (Board) which affirmed that part of the referee's decision awarding her total disability benefits but reversed the award of attorney fees against California University of Pennsylvania (Employer).

Claimant was employed as a custodial worker by Employer. On May 6, 1991, she filed a claim petition alleging that, on March 13, 1991, she injured her low back moving furniture in a recreation room. On June 10, 1991, Employer filed a timely answer denying the material allegations of the claim petition.

At a hearing before a referee, Claimant presented the deposition testimony of Mark Schultz, her treating chiropractor. Dr. Schultz testified that Claimant sustained an injury to the paravertebral soft tissue of the spine, an injury to the discs in the lumbar spine and a tear of the medial cartilage of the right knee. Dr. Schultz further testified that an MRI examination revealed posterior bulging with nerve foraminal encroachment at the L4–L5 level. Dr. Schultz testified that it was his professional opinion that Claimant's injuries were a direct result of her work-related injury of March 13, 1991 and that she was presently unable to return to her previous type of employment.

Employer presented the deposition testimony of Stuart L. Silverman, M.D., who examined Claimant on May 30, 1991. Dr. Silverman testified that he reviewed an MRI scan of Claimant's lumbar spine, taken on May 1, 1991, and found no disc herniation or nerve root impingement. Dr. Silverman testified that Claimant suffered a lumbar strain and that, at the time of his examination, she had no condition that would have prevented her from returning to her job.

The referee issued a decision on October 15, 1992 in which he found that Claimant had met her burden of proving that she had sustained an injury in the course of her employment.[1]

---

1. In March 1992, Employer filed a petition to review medical treatment and/or billing, alleging that further chiropractic treatment was unnecessary. Employer also filed a petition to terminate, alleging that Claim-

The referee also concluded that Employer's contest was unreasonable and assessed attorney fees against Employer. The referee stated that the denial notice issued by Employer denied benefits because "the events as described by the claimant were unwitnessed" and he did not find the basis of Employer's denial to be reasonable in light of the medical evidence which confirmed that Claimant sustained a work injury.[2] (Finding of Fact No. 15.) Employer then appealed to the Board which affirmed the decision of the referee to award total disability benefits. However, the Board found that Employer's contest was reasonable and reversed the referee's award of attorney fees against Employer. Claimant now appeals to this Court.[3]

The sole issue on appeal is whether the Board erred in determining that Employer's contest was reasonable and reversing the referee's award of attorney fees against Employer. Section 440 of the Pennsylvania Workers' Compensation Act[4] states in relevant part:

> In any contested case where the insurer has contested liability in whole or in part, the employe ... in whose favor the matter at issue had been finally determined shall be awarded, in addition to the award of compensation, a reasonable sum for costs incurred for attorney's fee ...: Provided, That cost for attorney fees may be excluded when a reasonable basis for the contest has been established.

ant had two separate neurological examinations and in each instance had been released to return to full duty. In his decision of October 15, 1992, the referee denied these petitions.

**2.** Although the referee's decision mentions Employer's notice of denial, the notice of compensation denial is not included as part of the original record.

**3.** Our scope of review of an order of the Board is limited to determining whether necessary findings of fact are supported by substantial evidence, whether constitutional rights have been violated or whether an error of law has been committed. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa.Commonwealth Ct. 436, 550 A.2d 1364 (1988).

**4.** Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 996, added by Section 3 of the Act of February 8, 1972, P.L. 25.

 The burden of presenting sufficient evidence to establish a reasonable basis for the contest is on the employer. *Delaware Valley Fish Co. v. Workmen's Compensation Appeal Board (Woolford)*, 151 Pa.Commonwealth Ct. 387, 617 A.2d 48 (1992). Whether a reasonable contest has been established for the purpose of an award of attorney fees is a question of law subject to review by this Court. *McConnell v. Workmen's Compensation Appeal Board (Western Center)*, 111 Pa.Commonwealth Ct. 521, 534 A.2d 571 (1987). As such, this Court may examine the record to determine if the evidence presented supports the conclusion. *Id.*

In the case *sub judice*, Dr. Silverman testified that the results of the neurological examination of Claimant were normal, that her subjective complaints of radicular pain were not brought out by the examination, that he based his diagnosis of lumbar strain on Claimant's subjective complaints and that, as of the date of the examination, her lumbar strain had resolved. Dr. Silverman also testified that a neural foramen encroachment, a slight disc bulge that comes close to the nerve root, cannot put pressure on the nerve, even if the person is engaged in activity.

 A reasonable contest may be established where medical evidence is conflicting or is susceptible to contrary inferences and where there is an absence of evidence that the employer's contest was frivolous or filed for purposes of harassment. *Mason v. Workmen's Compensation Appeal Board (Wheeling–Pittsburgh Steel Corp.)*, 143 Pa.Commonwealth Ct. 539, 600 A.2d 241 (1991), *petition for allowance of appeal denied*, 529 Pa. 671, 605 A.2d 335 (1992). Moreover, an employer may contest a claim in order to ascertain the proper period of disability. *White v. Workmen's Compensation Appeal Board (Gateway Coal Co.)*, 103 Pa.Commonwealth Ct. 397, 520 A.2d 555 (1987). Dr. Silverman's testimony was in conflict with that of Dr. Schultz as to the extent and duration of Claimant's disability. There is also no evidence that Employer's contest was frivolous or filed for the purposes of harassment. Thus, a reasonable basis was established for the contest of Claimant's claim.

Claimant also argues that an after-acquired medical opinion cannot provide a sufficient basis for establishing a reasonable contest. Employer cites *Yeagle v. Workmen's Compensation Appeal Board (Stone Container Corp.)*, 157 Pa.Commonwealth Ct. 597, 630 A.2d 558 (1993), for the proposition to reasonably contest an injury's relation to work, an employer must have in its possession, at the time the decision to contest is made or shortly thereafter, medical evidence supporting that position.

In the case before us, Dr. Silverman examined Claimant approximately two and a half months after she sustained her injury and prior to the filing of the answer to the claim petition. Thus, as required by *Yeagle,* Employer did have in its possession at the time it contested Claimant's petition, the necessary medical evidence.

Claimant further cites *Kuney v. Workmen's Compensation Appeal Board (Continental Data Systems)*, 127 Pa.Commonwealth Ct. 628, 562 A.2d 931 (1989), *petition for allowance of appeal denied,* 527 Pa. 604, 589 A.2d 694 (1990), for the proposition that an examination performed after the issuance of a notice of compensation denial cannot serve as a basis for establishing a reasonable contest. In *Kuney,* the employer's medical witness examined the claimant two and one half months after a notice of compensation denial was filed. This Court, while recognizing the general rule that the existence of conflicting medical evidence may provide a reasonable basis to contest liability, held that the employer's contest was unreasonable because the testimony of employer's doctor, even if found credible by the referee, would not have been sufficient, as a matter of law, to support an award in the employer's favor. *Kuney* does not hold that any medical examination performed after a notice of compensation denial is insufficient to establish a reasonable contest. In the case before us, Dr. Silverman's testimony, if found credible by the referee, could have supported a decision in Employer's favor.

The order of the Board is affirmed.

304

*ORDER*

**AND NOW,** this 4th day of November, 1994, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is affirmed.

650 A.2d 1112

**LUZERNE INTERMEDIATE UNIT # 18 EDUCATION ASSOCIATION, Appellant,**

v.

**PITTSTON AREA SCHOOL DISTRICT and Pittston Area Federation of Teachers, Local 1590,**

**LUZERNE INTERMEDIATE UNIT # 18 EDUCATION ASSOCIATION,**

v.

**PITTSTON AREA SCHOOL DISTRICT and Pittston Area Federation of Teachers, Local 1590, Pittston Area Federation of Teachers, Local 1590, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 22, 1994.

Decided Nov. 4, 1994.

A. Martin Herring, for appellant/appellee Luzerne Intermediate Unit # 18 Educ. Ass'n.

George F. Shovlin, for appellee/appellant Pittston Area School District.

Robert D. Mariani, for appellee/appellant Pittston Area Federation of Teachers Local 1590.

Before COLINS, President Judge, and FRIEDMAN, J., and KELTON, Senior Judge.

KELTON, Senior Judge.

This case involves cross-appeals from the August 30, 1993 Order of the Court of Common Pleas of Luzerne County (trial court) in which the court granted in part and denied in part the summary judgment motions of the opposing parties, Luzerne Intermediate Unit # 18 Education Association (L.I.U. # 18), Pittston Area School District (District) and Intervenor Pittston Area Federation of Teachers, Local 1590 (Federation). Although L.I.U. # 18 and the Federation have appealed, the District has not. We affirm the order of the trial court.

## FACTS

The following facts are not in dispute. Luzerne Intermediate Unit provides special education services to various school districts in Luzerne County. Prior to the 1992–93 school year, the Intermediate Unit provided the District with school psychologists, special services and professional employees to staff learning support classes and speech and language support classes. Due to budgetary considerations and a substantial decline in its student enrollment, the District decided to realign its staff and to provide these services itself. In March 1992, the Department of Education approved the District's proposed staffing realignment in which fifteen classes or programs were eliminated and only the least senior District employees were furloughed.

Pursuant to the Transfer of Entities Act (Act) of the Public School Code of 1949,[1] twelve programs were transferred from the Intermediate Unit to the District. The District realigned its staff and utilized five of its own teachers to staff five of the transferred programs. The District then employed six Intermediate Unit professionals, members of L.I.U. # 18, to staff the remaining programs. Five teachers and one psychologist from the Intermediate Unit were not employed by the District. The District then placed the six transferred teachers on step three of the District's salary schedule and credited them with up to but not more than two years seniority credit for their service with the Intermediate Unit.

L.I.U. # 18 filed a complaint against the District, alleging that the Act required that the District hire all twelve Intermediate Unit professionals when it transferred the twelve programs. It further alleged that the transferred teachers were entitled to credit for all their years of service at the Intermediate Unit.

The parties filed cross-motions for summary judgment. The trial court determined that the District was not required to hire all twelve of the L.I.U. # 18 teachers because only six teachers were "needed" to staff the transferred programs. The trial court determined that the Act only requires that the District, as receiving entity, hire those professionals from the transferring entity who are needed to staff the program. The District did not need the other five L.I.U. # 18 professionals because it already had a sufficient number of properly certificated employees of its own to staff the remaining programs.

The trial court further determined that the District did not properly credit the transferring teachers' years of service and ordered that they receive seniority credit for all their years of service with the Intermediate Unit.

L.I.U. # 18 appealed that part of the trial court's order providing that the District need not hire the remaining L.I.U. # 18 professionals. The Pittston Area Federation of Teachers

1. Act of March 10, 1949, P.L. 30, *as amended*, added by Section 5 of the Act of February 4, 1982, P.L. 1, *as amended*, 24 P.S. § 11–1113.

appealed the portion of the court's order allowing full seniority credit for teachers transferred from the Intermediate Unit to the District.

## ISSUES

The two issues raised on these cross-appeals are: (1) whether the District violated the Act when it failed to hire all twelve L.I.U. # 18 professionals after it transferred twelve programs from L.I.U. # 18 to the District; and, (2) whether the Act requires that the transferred L.I.U. # 18 employees receive seniority credit for all their years of service at L.I.U. # 18.

## NUMBER OF INTERMEDIATE UNIT EMPLOYEES ENTITLED TO PITTSTON POSITIONS

■ Section 1113 of the Transfer of Entities Act provides, in pertinent part, as follows:

(a) When a program or class is transferred as a unit from one or more school entities to another school entity or entities, professional employes who were assigned to the class or program immediately prior to the transfer and are classified as teachers as defined in section 1141(1) and are suspended as a result of the transfer and who are properly certificated shall be offered employment in the program or class by the receiving entity or entities *when services of a professional employee are needed to sustain the program or class transferred,* as long as there is no suspended professional employe in the receiving entity who is properly certificated to fill the position in the transferred class or program.

(b) *Transferred professional employes shall be credited by the receiving entity* only for their sick leave accumulated in the sending entity and also for *their years of service in the sending entity,* the latter *for purposes of* sabbatical leave eligibility and *placement in the salary schedule:* Provided, however, That such employes shall not utilize the sabbatical leave until they have taught in the receiving entity for a period of three (3) years. Such employes shall

transfer their accrued seniority in the area of certification required for the transferred program or class only.

. . . .

(c) Nothing contained in this section shall be construed to supersede or preempt any provision of a collective bargaining agreement in effect on February 4, 1982, and negotiated by a school entity and an exclusive representative of the employes in accordance with the act of July 23, 1970 (P.L. 563, No. 195), known as the "Public Employe Relations Act."

24 P.S. § 11–1113. (emphasis added) (footnotes omitted).

L.I.U. # 18 argues that subsection (a) of the Act requires that the District hire all twelve L.I.U. # 18 professional employees after it transferred their programs to the District. L.I.U. # 18 argues that the legislative intent of the Act was to maintain teaching continuity, whenever possible, by having previous teachers transfer with their program when there is a transfer of classes. According to L.I.U. # 18, allowing the District to realign its staff whenever a program or class is transferred would eliminate the protections extended to the sending entity's staff and the students enrolled in the classes and programs, thereby defeating the legislative intent of the Act.

L.I.U. # 18 further argues that the trial court erred in finding that the District was in compliance with the Act when it determined that it did not "need" the additional six L.I.U. # 18 professional employees. The District required twelve professional employees to staff the twelve transferred classes and programs. Therefore, the District was required to hire the twelve L.I.U. # 18 professionals. We disagree.

It is clear that the Legislature intended to protect the Intermediate Unit teachers. In *Allegheny Intermediate Unit # 3 Education Association v. North Hills School District,* 155 Pa.Commonwealth Ct. 211, 624 A.2d 802 (1993), this Court stated that "there is nothing absurd about the legislature taking special action to protect intermediate unit teachers at a

time when it anticipates that many of them will be suspended." *Id.* at 218, 624 A.2d at 805. The Act, however, also purports to protect the jobs of school district employees. Subsection (a) of Section 1113 clearly states that an employee transferred from the sending entity must be employed, when needed, "as long as there is no suspended professional employe in the receiving entity who is properly certificated to fill the position...." 24 P.S. § 11–1113. The clear intent of that clause is to protect also the jobs of the receiving entity's professional employees.

Due to declining student enrollment, the District proposed a realignment of its staff. Under the "checkerboarding" layoff and transfer system employed by the District, the professional employees with the most seniority would keep their jobs. The District's realignment eliminated the need for fifteen employees. The limited transfer of the L.I.U. # 18 classes and programs, however, allowed the District to keep five of its own employees, reducing the number of District employees to be furloughed to ten. Even though those five District employees were never actually "suspended," the result of employing all twelve L.I.U. # 18 employees to staff the transferred classes and programs would have been to furlough those five District employees. We must conclude that the Act's intention was to provide such protection to the District's employees.

It is further clear to us that, because the District had properly certificated professional teaching personnel available to staff the transferred classes and programs, the District did not "need" the additional six L.I.U. # 18 employees.

For the above reasons, we affirm the order of the trial court regarding the District's actions in failing to hire the remaining L.I.U. # 18 employees.

## SENIORITY CREDIT

The trial court further ordered that a transferred employee receive seniority credit in placement on the salary schedule for all of his or her respective years of service in L.I.U. # 18 in the area of certification required for the trans-

ferred program. The District did not appeal this portion of the trial court's order. As bargaining representative of the District's teachers, the Federation, however, did.

Subsection (b) of the Act clearly states that transferred employees shall be credited by the receiving entity for their years of service in the sending entity. The Federation argues, however, that subsection (c) nullifies that language. Subsection (c) provides that nothing in the Act should be construed to supersede or preempt a collective bargaining agreement (CBA) in effect on February 4, 1982. Although the current 1991–1995 CBA between the District and the Federation was not in effect on February 4, 1982, the Federation argues that subsection (c) was intended to protect against the preemption of any *provision* of a CBA in effect on February 4, 1982.

The Federation also argues that Article 3 of the current CBA was also in the CBA in effect on February 4, 1982. Article 3 recognizes and grants contractually enforceable status to the parties' practices.[2] The Federation contends that the District's practice of transferring credit for seniority purposes was that a *maximum* of two years seniority credit was allowed for years of service outside the school district; and that this practice was memorialized by a prior arbitration award to that effect.

The Federation also argues that the language of subsection (c) refers to *provisions* of CBAs, and not to whole CBAs. According to the Federation, subsection (c) would be a legislative nullity if it were interpreted to mean that whole CBAs must be in effect on February 4, 1982. We need not address this argument, however, because we find that the Federation has not presented competent evidence that the past practice of the parties was to grant a maximum of two years credit to transferring employees.

**2.** The Board and its representatives shall take *no action violative of, or inconsistent with, any provision of this* Agreement or any policy or practice governing working conditions of teachers existing on the date of execution of this Agreement. (Article III, section 2) (emphasis added).

As noted by the trial judge, the Honorable Correale F. Stevens, the Federation's evidence of an alleged "past practice" of allowing no more than two years of seniority credit was based upon a prior arbitration award. That award, however, involved a teacher who had only two years of prior service. Also, it did not involve a teacher transfer under Section 1113 of the Act, 24 P.S. § 11–1113. Thus, the past practice relied on by the Federation was not applicable to this case. Here a specific section of the School Code applies.

Mr. Gerard Musto, the Superintendent of the Pittston Area School District, testified as follows:

A. Okay. To my understanding, anyone who is employed by the Pittston Area School District that has come from another entity that they can only receive credit for two previous years to be placed on the third step [of the salary schedule]. We've done this with employees in our District[.] To my knowledge, we've had an arbitration ruling and it is our interpretation with the solicitor that they would go on the third step. (R.R. at 103a.)

. . . .

Q. Has there ever been prior to this transfer from the Intermediate Unit to [the District], has there ever been another transfer of entities between the Intermediate Unit and [the District] in the past?

A. Of personnel?

Q. Yes, sir.

A. Not to my knowledge.

Q. This arbitrator's award I think—and it'll speak for itself—but in any event, it doesn't involve a transfer of entity situation. It involves a new hire. Am I correct?

A. I assume. It has that somewhere. (R.R. at 103a.)

It is clear that there has never been a "past practice" of only granting a maximum of two years seniority credit to teachers transferred pursuant to the Act because there has never been such a transfer in the District before. It is equally clear that the arbitration award does not apply to the facts of

this case because it did not involve a transfer from one entity to another, but involved a newly hired teacher.

The rules of statutory construction require that we give the words in a statute their common and approved usage. The Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a). The language used in the statute is not ambiguous. Section 1113(b) of the Act provides that: "Transferred professional employes shall be credited by the receiving entity . . . for their years of service in the sending entity . . . for purposes of . . . placement in the salary schedule." 24 P.S. § 11–1113(b).

Further, the CBA currently in effect does not contain a provision which states that transferred professional employees should be given a maximum of two years seniority credit. The provision relied upon by the Federation simply enforces "past practices" of the parties, but as noted above, that practice did not involve teachers being transferred into the receiving school district from another school entity.

It should be noted that the Department of Education issued Basic Education Circular # 15–91 in which it set forth its understanding of Section 1113(b). "The Department understands Section 1113 to mean that whatever credit for seniority or years of service was recognized by the sending entity, must also be recognized by the receiving entity." (R.R. at 224a.) The Department of Education is the agency empowered to supervise all the public schools in the Commonwealth. Construction of a statute by those charged with its administration and execution, though not binding on a court, should be given some deference by the courts. *Board of Education of Fairview School District v. Tomb*, 40 Pa.Commonwealth Ct. 458, 397 A.2d 1268 (1979). We do not find the Board of Education's interpretation of the statute to be unwise or violative of legislative intent. Therefore, we adopt its interpretation and affirm the order of the trial court allowing full seniority credit to the transferred employees.

Affirmed.

314

## ORDER

**AND NOW,** this 4th day of November, 1994, the order of the Court of Common Pleas of Luzerne County dated August 30, 1993 is hereby affirmed.

650 A.2d 1117

**DEPARTMENT OF PUBLIC WELFARE, Petitioner,**

v.

**MAPLEWOOD MANOR CONVALESCENT CENTER, INC., Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Sept. 22, 1994.

Decided Nov. 4, 1994.

316

Jeffrey W. Bechtel, for petitioner.

No appearance, for respondent.

Before DOYLE and NEWMAN, JJ., LORD, Senior Judge.

NEWMAN, Judge.

The Department of Public Welfare (DPW) appeals an order of the Commonwealth of Pennsylvania, Board of Claims (Board). This order required DPW to pay fifty dollars for a

legal filing fee to Maplewood Manor Convalescent Center (Maplewood) after DPW and Maplewood filed a Stipulation of Settlement with DPW's Office of Hearings and Appeals (OHA) that included a provision that both parties would bear their own expenses.

Maplewood is a nursing home provider enrolled in the Medical Assistance Program. Through this program, DPW reimburses Maplewood for expenses, the sole state agency that administrates the Medical Assistance Program.

A dispute arose between Maplewood and DPW when Maplewood sought reimbursement and payment from DPW for services it rendered through a Medical Assistance Program contract. On January 26, 1993, Maplewood filed an appeal before OHA, and on March 2, 1993, a complaint before the Board against DPW to recover this payment. However, on August 5, 1993, prior to a hearing before either the Board or OHA, Maplewood and DPW discussed their dispute and agreed to enter a Stipulation of Settlement. In pertinent part, this agreement stipulated that each party was to bear its own costs.

One week later, OHA adopted the Stipulation and instructed DPW to carry out its terms. Pursuant to this private settlement, Maplewood sent a letter to the Board on August 13, 1993, withdrawing and discontinuing its claim against DPW.

Despite Maplewood's withdrawal, the Board issued an opinion and order in this matter dated October 29, 1993. The Board concluded that the Stipulation was reasonable and fair, and it ordered DPW to pay Maplewood's fifty dollar legal filing fee. The Board's ruling regarding this filing fee directly contradicts the terms of the Stipulation between Maplewood and DPW in which each party is to bear its own costs.

On November 23, 1993, DPW filed a petition for review requesting this Court to reverse the Board's order and to bar the Board from investigating or altering settlement agreements in the future.

On appeal, DPW raises the following issues before this Court: (1) whether the Board had authority to investigate the

reasonableness of the settlement between Maplewood and DPW; (2) whether the Board has authority to alter this settlement agreement; and (3) whether the Board infringed upon the right of OHA to adopt settlement agreements for appeals in the Medical Assistance program. We now turn to the resolution of these issues.[1]

Pennsylvania statute empowers the Board to arbitrate claims filed against the Commonwealth of Pennsylvania. Section 4 of Act of May 20, 1937, P.L. 728, No. 193, *as amended,* 72 P.S. §§ 4651–4. However, "[t]here is no mention [in the regulations] of any [Board] power to investigate claims when the parties in interest wish to settle and discontinue them." *Paul and Peter's Check Cashing v. Department of Labor and Industry, State Workman's Insurance Fund,* 135 Pa.Commonwealth Ct. 373, 379, 582 A.2d 397, 400 (1990).

Moreover, the Board has adopted the Pennsylvania Rules of Civil Procedure that do not provide general investigating power or require court approval for settlement agreements. *See* Pa.R.C.P. No. 229 (parties may settle and discontinue cases). Under Pa.R.C.P. Nos. 2039(a), 2206(a), 2064, and 2230(b), the power of parties to settle and discontinue cases is subject to court approval where the matter concerns a minor, an incompetent, or a class action. Thus, because these exceptions are not involved here, the Board has no power to investigate the settlement between DPW and Maplewood.

The Board's own regulations recognize this point. In reviewing the Board's rules, this Court previously has concluded that "[n]othing in these rules subjects ordinary settlements to board investigation." *Paul and Peter's Check Cashing,* 135 Pa.Commonwealth Ct. at 380, 582 A.2d at 401. Based upon Pennsylvania statutory and case law, we conclude that the Board erred in investigating the reasonableness of the Stipulation between Maplewood and DPW.

1. Our standard of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed and whether factual findings necessary to support the adjudication are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

■ Next, we answer whether the Board had authority to change the Stipulation in this matter. Because there is no authorization to investigate this agreement, the Board does not have the authority to identify sections of the settlement that it wishes to alter. The pertinent regulations are found at 4 Pa.Code Sections 121.14–121.16. Nothing in these regulations authorizes the Board to vary agreements.

Section 121.14 of the Board's regulations states, in pertinent part, that:

the terms of the settlement shall include an agreement to pay the costs in the case. Upon request the Board will promptly inform the litigants of the amount thereof and the agreement of settlement shall specifically impose the payment of the amount on one or more of the parties, *as they may agree.*

4 Pa.Code § 121.14. (emphasis added)

Section 121.15 of the Code requires that the parties who enter settlements notify the Board within ten days and file a statement describing the settlement. 4 Pa.Code § 121.15. Section 121.16 states that when "a proposed settlement is finally concluded," the parties shall "so notify the board in writing and the board shall mark its records of the case accordingly." 4 Pa.Code § 121.16. By regulation, the Board is to be informed of the contents and finality of settlement agreements, but it is not empowered to participate in the brokering or judgment of the specific terms of settlements.

In this case, under the provision of the Stipulation that states "each party shall bear its own cost," Maplewood agreed to pay its own filing fee. The Board committed error when it altered the Stipulation between Maplewood and DPW in the assignment of the filing fee to DPW. Maplewood and DPW were free to determine the assignment of costs themselves.

■ Finally, we turn to the question of whether the Board failed to afford proper deference to the competence and expertise of OHA to adopt settlement agreements in appeals involving the Medical Assistance program.

If the Board or OHA has jurisdiction over appeals and settlements in the Medical Assistance Program, it is not defined by statute. In *Department of Public Welfare v. Shapiro,* 91 Pa.Commonwealth Ct. 64, 496 A.2d 887 (1985), this Court held that OHA has exclusive jurisdiction in a Medical Assistance appeal in two instances: (1) where the issue is determining eligibility for benefits; and (2) where the issue is whether, and to what extent, a provider may have violated the terms of an agreement with DPW. Otherwise, the Board has jurisdiction over a Medical Assistance Program appeal. *Id.*

In this matter, Maplewood's complaint against DPW fits into neither of the exceptions of *Shapiro.* Accordingly, we find that the Board had jurisdiction over the subject matter of this dispute, although it did not have the power to alter the private settlement agreement reached by the parties.

We, therefore, reverse the order of the Board of Claims.

## ORDER

AND NOW, November 4, 1994, we reverse the order of the Board of Claims.

650 A.2d 1120

**Anna M. BURKEY, Petitioner,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (INFORMATION NETWORK SYSTEMS), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Aug. 19, 1994.

Decided Nov. 7, 1994.

322

Peter J. Verderame, for petitioner.

Annabelle R. Cedar, for respondent.

Before PELLEGRINI, and FRIEDMAN, JJ., and RODGERS, Senior Judge.

RODGERS, Senior Judge.

Anna M. Burkey (Claimant) petitions for review of an order of the Workmen's Compensation Appeal Board (Board) which affirmed a referee's decision granting Claimant's claim petition and awarding compensation for a closed period from December 28, 1988 through July 19, 1989. The referee suspended benefits effective July 20, 1989, based on a finding that

Claimant had refused reasonable and necessary medical treatment.[1] We reverse.

The following facts are not disputed for purposes of this appeal. On January 5, 1988, Claimant sustained a work-related injury to her arm and shoulder during the course of her employment with Information Network Systems (Employer). Claimant sought treatment that evening from Evelyn D. Witkin, M.D., a board licensed orthopedic surgeon, who, following a more conservative course of treatment, ultimately recommended surgery.

Invoices and accompanying reports regarding Claimant's medical treatment were sent regularly to Employer. Employer made an initial payment to Dr. Witkin, then ceased paying Claimant's medical bills without challenging the reasonableness or necessity of the treatment and without explanation.

Claimant gave timely notice to Employer of her injury. Claimant continued working until December 29, 1988, at which time she became disabled. Claimant was terminated by Employer in January 1989.

Claimant filed a petition for compensation on March 6, 1989. Employer filed a timely answer denying every allegation in Claimant's petition,[2] and the case was assigned to a referee.

During the course of hearings, Claimant testified regarding the circumstances of her injury and resulting disability. Claimant presented the deposition testimony of Dr. Witkin, who opined that Claimant was totally disabled. Employer presented the deposition testimony of Richard J. Mandel,

1. Section 306(f)(4) of The Pennsylvania Workmen's Compensation Act (Act), Act of June 2, 1915, P.L. 736 *as amended*, 77 P.S. § 531(4), provides in part: "If the employe shall refuse reasonable services of duly licensed practitioners of the healing arts, surgical, medical and hospital services, ... he shall forfeit all rights to compensation for any injury or any increase in his incapacity shown to have resulted from such refusal." (Section 306(f) was amended in July 1993 and renumbered as Section 306(f.1).)

2. In its answer, Employer denied that the nature of its business was commercial computer sales and that Claimant was employed as a purchasing agent; Employer conceded these facts at the first hearing on May 9, 1989.

M.D., who is also board certified in orthopedic surgery and who examined Claimant on July 25, 1990. Dr. Mandel testified that Claimant was not disabled and is capable of returning to work. He also opined that Claimant's pain did not warrant surgery.

In a decision dated June 23, 1992, the referee found that Claimant had met her burden of proving that she became disabled on December 28, 1988, and remained disabled, as the result of a work-related injury. The referee ordered Employer to pay compensation, medical bills, interest, attorney's fees and costs.[3] However, the referee found that Claimant refused reasonable and necessary medical treatment as of July 20, 1989, when Dr. Witkin first suggested surgery, and ordered benefits suspended as of that date.

Claimant appealed to the Board, asserting that she had not refused reasonable medical treatment and that the referee's finding on this issue was not supported by substantial evidence. Claimant also alleged that the referee erred in failing to award certain costs. The Board agreed with the latter contention, assuming that the referee's failure to award those

3. A reasonable sum for attorney's fees and other costs is awarded to a successful claimant pursuant to Section 440 of the Act unless the employer establishes a reasonable basis for the contest. In awarding attorney's fees to Claimant, the referee concluded as a matter of law that the basis for Employer's contest was unreasonable. *Poli v. Workmen's Compensation Appeal Board*, 34 Pa.Commonwealth Ct. 630, 384 A.2d 596 (1978).

However, where a claimant fails to request counsel fees, the referee is precluded from assessing attorney's fees *sua sponte*. *MacNeill v. Workmen's Compensation Appeal Board (Denny's, Inc.)*, 120 Pa.Commonwealth Ct. 320, 548 A.2d 680 (1988). Additionally, the question of what constitutes a "reasonable sum" for such fees is a conclusion of law, dependent upon findings of fact as to the amount and degree of difficulty of the work performed. *Eugenie v. Workmen's Compensation Appeal Board (Sheltered Employment Service)*, 140 Pa.Commonwealth Ct. 51, 592 A.2d 358 (1991).

We note that, in this case, the record does not reflect a request for counsel fees by Claimant and further, that the referee neglected to make findings as to the reasonableness of the fees she awarded. As Employer did not appeal the award or amount of attorney's fees before the Board, it has waived the right to do so in a subsequent proceeding.

costs was merely an oversight.[4] However, the Board conclud-
ed that the referee's finding that Claimant had refused reason-
able medical treatment was supported by the testimony of
both medical experts and affirmed the referee's decision sus-
pending compensation.

On appeal to this Court,[5] Claimant argues that: 1) the
referee's finding that Claimant refused reasonable medical
treatment is not supported by substantial evidence; 2) the
referee erred in relying on medical testimony taken out of
context; 3) Employer's failure to pay for Claimant's medical
treatment precludes a finding that Claimant refused medical
treatment; 4) Employer's refusal to pay for Claimant's rea-
sonable medical treatment warrants the imposition of a penal-
ty; and 5) the referee erred in retroactively suspending
benefits.

Claimant first contends that the referee's Finding of
Fact 11, that Claimant refused reasonable medical treatment
as of July 20, 1989, is not supported by substantial evidence.
After review of the record we agree.

At a hearing on May 9, 1989, Claimant testified that she had
not received payment for medical expenses and continued to
receive reminders of outstanding bills. (N.T. 26.) At a
subsequent hearing on November 7, 1990, Claimant testified
that Dr. Witkin had recommended surgery, and it was Claim-
ant's belief that Dr. Witkin was awaiting the outcome of the
hearings before proceeding with the surgery. (N.T. 5.)

4. In Finding of Fact 13, the referee itemized bills for medical treatment,
totalling $17,292.39, and found them to be reasonable and necessary.
On appeal to the Board, Claimant alleged that the referee erred in not
including five medical bills in that Finding of Fact. In an attempt to
correct what the Board perceived to be an oversight, the Board ordered
the award of all costs set forth in Finding of Fact 13. As Claimant
specifically sought payment for expenses not included in that finding,
the Board's order did not remedy the perceived oversight.

5. Our scope of review in a workmen's compensation appeal is limited
to determining whether an error of law was committed, constitutional
rights were violated, or whether necessary findings of fact are sup-
ported by substantial evidence. Section 704 of the Administrative
Agency Law, 2 Pa.C.S. § 704. *Russell v. Workmen's Compensation
Appeal Board (Volkswagen of America)*, 121 Pa.Commonwealth Ct. 436,
550 A.2d 1364 (1988).

Claimant also believed that Dr. Witkin had discharged her from physical therapy because the bill was not being paid. (N.T. 5, 8–9.)

The referee made no determination regarding Claimant's credibility. However, the referee accepted the testimony of Dr. Witkin as competent, credible, persuasive and unequivocal (Referee's decision, p. 1), and Dr. Witkin's testimony directly contradicts the finding that Claimant refused medical treatment.

Dr. Witkin testified that she first recommended surgery to Claimant on July 20, 1989, and suggested, on August 17, 1989, that Claimant continue occupational therapy "until such a time as she is cleared for surgery." (N.T. 28.) Dr. Witkin testified that, as of November 14, 1989, surgical intervention was still being debated and that, on November 30, 1989, she and Claimant were "still awaiting okay for surgical intervention." (N.T. 30.) Again, on January 9, 1990, Dr. Witkin suggested that Claimant "be cleared for surgery". (N.T. 31.) Dr. Witkin also testified that the balance of Claimant's bill, approximately $2100.00, had not been paid. She stated that she continued to forward reports to the insurance company and had received an initial payment, but that payments had since ceased. (N.T. 51.)

On cross-examination, Dr. Witkin testified as follows:

Q. Doctor, did you recommend surgery?

A. I did.

Q. And what was Ms. Burkey's response?

A. She was concerned with getting insurance.

Q. Did she agree to having surgery?

A. Yes, she did.

(N.T. 37.) After describing two different types of surgery, Dr. Witkin was asked:

Q. And [Claimant] is entertaining undergoing either one of these surgeries?

A. Yes.

Q. More invasive surgery?

A. Yes.

(N.T. 38.) [6]

■ Where a determination is based on medical testimony that testimony must be taken as a whole; the final decision on a claimant's entitlement to benefits should not rest upon a few words taken out of context. *Wilkes–Barre City v. Workmen's Compensation Appeal Board*, 54 Pa.Commonwealth Ct. 230, 420 A.2d 795 (1980). Taken as a whole, Dr. Witkin's testimony provides no support for the referee's finding that Claimant refused surgery.

Additionally, we cannot ascertain whether the referee properly focused on the reasonableness of the proposed treatment because the referee made no findings on this issue.[7] A determination that a claimant refused reasonable medical treatment must be based on findings of fact which are supported by substantial evidence; absent such findings, the determination cannot be upheld.

■ Furthermore, the burden of proving that a claimant refused reasonable medical treatment rests with the employer. *Mackintosh–Hemphill, Div. of G. & W. Mfg. Co. v. Workmen's Compensation Appeal Board (Banicki)*, 116 Pa.Commonwealth Ct. 401, 541 A.2d 1176 (1988). In this case, Employer's only evidence was the deposition testimony of Dr. Mandel, who opined that Claimant was not disabled (N.T. 22–23), that certain treatment prescribed by Dr. Witkin was not necessary (N.T. 26) and that an open surgical procedure was not warranted. (N.T. 29, 31.) [8] Employer presented no evidence to

6. Inexplicably, the Board cites this very testimony as substantial evidence which supports the referee's finding that Claimant refused the proposed surgery.

7. The focus of Section 306(f)(4) is on the reasonableness of the services offered, not the reasonableness of a claimant's refusal. *Steel City Painting Co. v. Workmen's Compensation Appeal Board (Platko)*, 152 Pa.Commonwealth Ct. 270, 618 A.2d 1199 (1992).

8. The Board took this testimony, which was rejected by the referee, to mean that Dr. Mandel concurred that surgery was indicated, and stated that it too supported the referee's finding that Claimant had refused reasonable medical treatment.

establish that Claimant had refused reasonable medical treatment and failed to elicit such evidence on cross-examination.

■ We also agree with Claimant's assertion that a finding that Claimant refused reasonable medical treatment is precluded by Employer's failure to pay for Claimant's reasonable medical services. An employer is required to tender reasonable medical services to an employee injured in a work-related accident before the employee can be disqualified from benefits for refusing treatment. *Abington Memorial Hosp. v. Workmen's Compensation Appeal Board (Wyche)*, 151 Pa.Commonwealth Ct. 258, 616 A.2d 767 (1992), *petition for allowance of appeal granted*, 534 Pa. 641, 626 A.2d 1159 (1993). Additionally, a finding that a claimant refused reasonable medical treatment requires unequivocal evidence that the employer authorized such treatment. *Mackintosh–Hemphill.*

■ Employer has not paid Claimant's medical bills, and the record contains no evidence that Employer authorized the recommended surgery. However, Employer contends that *Abington* is distinguishable because in *Abington* the court specifically found that the employer had refused to pay for medical services, while in this case there was no such adjudication. Employer also asserts that there is no evidence in this case to demonstrate that Employer would have refused to pay for recommended medical treatment once Claimant's injury had been deemed compensable. We find this argument to be without merit; the evidence of record precludes a finding that Employer authorized any treatment which Claimant then refused.

■ Claimant next asserts that Employer's unilateral refusal to pay for medical treatment, without challenging the reasonableness or necessity of the treatment, merits the imposition of a penalty. Employer responds that "[i]t is axiomatic that an employer has no obligation to pay medical expenses" absent a determination that Claimant sustained a work-related injury. (Employer's brief, p. 12.) We find no support for this "axiom". To the contrary, Section 306(f) of the Act provides:

The following schedule of compensation is hereby established:

(1) The employer shall provide payment for reasonable surgical and medical services ... medicines, and supplies, as and when needed.

\* \* \* \* \* \*

(4) ... The provisions of this section shall apply in injuries whether or not loss of earning power occurs.

77 P.S. § 531.[9] Medical benefits under Section 306(f)(1) of the Act are payable without regard to whether a notice of compensation payable or written agreement is issued, since they are payable even where there is no loss of earnings or no compensable disability. There is no waiting period for medical benefits. *See Jackson Township Volunteer Fire Co. v. Workmen's Compensation Appeal Board (Wallet),* 140 Pa.Commonwealth Ct. 620, 594 A.2d 826 (1991).[10]

In *Moats v. Workmen's Compensation Appeal Board (Emerald Mines Corp.),* 138 Pa.Commonwealth Ct. 449, 588 A.2d 116 (1991), the court addressed the issue as follows:

It is a clear and unacceptable violation of the Act for an employer to unilaterally refuse to pay a claimant's medical bills. *Johnson v. Workmen's Compensation Appeal Board (Albert Einstein Medical Center),* 137 Pa.Commonwealth Ct. 176, 586 A.2d 991 (1991). If an employer disputes the

**9.** The term compensation includes medical benefits. *Workmen's Compensation Appeal Board v. DelCimmuto,* 23 Pa.Commonwealth Ct. 43, 350 A.2d 459 (1976). Section 406.1 of the Act, 77 P.S. § 717, provides that the first installment of compensation is due not later than twenty-one days after the employer has notice or knowledge of the claimant's disability, and further provides for the accrual of ten percent interest on all due and unpaid compensation from the date each installment is due. Interest is allowed on medical expenses from the date the claim is presented. *Frymiare v. Workmen's Compensation Appeal Board (D. Pileggi & Sons),* 105 Pa.Commonwealth Ct. 325, 524 A.2d 1016 (1987), *petition for allowance of appeal denied,* 518 Pa. 644, 542 A.2d 1372 (1988).

**10.** Under the 1993 amendments to the Act, an employer is required to make payments of medical expenses within thirty days of receipt of bills and records from the health care provider, unless the employer disputes the reasonableness or necessity of the treatment by proceedings pursuant to Section 306(f.1)(6) of the Act.

reasonableness or necessity of a claimant's medical bills or treatment, it may petition for review of these matters pursuant to Section 306(f)(2)(ii) of the Act, 77 P.S. 531(2)(ii). The filing of a petition under this section, however, may not act as a supersedeas; and the employer shall be responsible for paying all medical bills incurred during the pendency of the petition. Id. Further, any relief granted an employer pursuant to Section 306(f)(2)(ii) is prospective only as of the date the referee determines that the medical expenses are unreasonable or unnecessary; the employer may not seek reimbursement from the claimant or be relieved from paying past medical bills. Id.; *Boehm v. Workmen's Compensation Appeal Board (United Parcel Services)*, 133 Pa.Commonwealth Ct. 455, 576 A.2d 1163 (1990). If an employer has paid medical bills later determined to be unreasonable or unnecessary, it may seek reimbursement from the Supersedeas Fund. *ADIA Personnel Agency v. Workmen's Compensation Appeal Board (Coleman)*, 137 Pa.Commonwealth Ct. 405, 586 A.2d 507 (1991).

*Id.* 138 Pa.Cmwlth. at 453–54, 588 A.2d at 118.

There is no question that an employer is required to pay for reasonable medical services provided to a claimant as and when needed, and this Court has held that penalties were warranted for an employer's failure to pay compensation and medical bills, prior to the issuance of a notice of compensation payable. *Spangler v. Workmen's Compensation Appeal Board (Ford)*, 145 Pa.Commonwealth Ct. 56, 602 A.2d 446 (1992).

In *Spangler*, the court held that a penalty was warranted based upon the employer's failure to promptly investigate the reported injury, in violation of Section 406.1 of the Act, 77 P.S. § 717.4. In this case, Claimant promptly notified Employer of her injury and resulting disability, Employer received regular reports from Dr. Witkin beginning in January 1988, and Claimant's claim petition was filed on March 6, 1989. As Employer's only evidence was the testimony of a doctor who did not examine Claimant until July 25, 1990, we conclude that Employer also failed to comply with Section 406.1 of the Act.

Employer correctly states that penalties may not be imposed absent a violation of any provision of the Act [11], but the record contains ample evidence establishing that Employer violated the Act in refusing to pay Claimant's medical expenses, failing to file a petition for review, and failing to promptly investigate Claimant's injury. However, Employer correctly asserts that a penalty may not be imposed before notice and hearing is afforded the party accused of noncompliance. *Edmond v. Workmen's Compensation Appeal Board,* 43 Pa.Commonwealth Ct. 458, 402 A.2d 715 (1979). Claimant made no request, either in writing or on the record, that the referee impose a penalty; consequently, no hearing was held on this issue. For this reason, Claimant is not entitled to penalties.

Finally, Claimant argues that the referee also erred in suspending Claimant's benefits retroactively, and again, we agree. First, the referee erred when, after the close of hearings and the receipt of evidence, she decided *sua sponte* to suspend Claimant's benefits on the grounds that Claimant had refused reasonable medical treatment. The referee is empowered to grant only such relief as is actually requested in the filed petition. *Boehm.* We recognize that the form of a petition is not controlling where the facts warrant relief for a *claimant. Id.* In this case, however, Claimant was unfairly prejudiced when the referee looked beyond the pleadings and granted an unsolicited suspension to Employer after hearings concluded, as Claimant was denied any opportunity to object or prepare for such a result.

Employer contends that Claimant failed to raise this issue before the Board and thus has waived the right to raise it before this Court. However, we believe that Claimant sufficiently raised this issue with respect to medical benefits when Claimant argued to the Board that it was error for the referee to exclude certain medical bills from Finding of Fact 13. These items are not included in the record. However, the record indicates that at least one item represents services

11. Section 435(d) of the Act, 77 P.S. § 991(d).

incurred in 1990. As the referee found that Claimant refused reasonable medical treatment as of July 20, 1989, it is likely that the referee's exclusion of these items was intentional, and not, as the Board concluded, a mere oversight. If the referee's exclusion of these bills was intentional, the referee compounded her error, because the relief afforded by Section 306(f)(2)(ii) is prospective only; medical benefits under the Act may be terminated only as of the date of the referee's determination that future benefits are unnecessary and unreasonable. *Loose v. Workmen's Compensation Appeal Board (John H. Smith Arco Station)*, 144 Pa.Commonwealth Ct. 332, 601 A.2d 491 (1991).

Employer contends that *Loose* is inapplicable because, unlike the claimant in *Loose*, Claimant here was not receiving benefits pursuant to a notice of compensation payable and Employer did not file a petition for review. As medical expenses are payable without the necessity of a notice of compensation payable, this distinction is of no moment. Employer's failure to comply with the provisions of the Act does not render those provisions inapplicable.

Although the referee's errors include granting *sua sponte* an unsolicited suspension of benefits, relying on medical testimony taken out of context, and failing to make findings of fact regarding the reasonableness of the proposed treatment, our decision specifically rests on the conclusion that the referee's finding that Claimant refused reasonable treatment is not supported by substantial evidence.

Accordingly, we affirm that portion of the Board's decision reversing the exclusion of certain medical bills from the referee's award, and we reverse the portion of the Board's decision affirming the referee's suspension of benefits as of July 20, 1989.

## ORDER

NOW, November 7, 1994, the order of the Workmen's Compensation Appeal Board, dated March 7, 1994, is affirmed insofar as it reverses the exclusion of certain medical bills

from the referee's award; the order is reversed as to the suspension of benefits as of July 20, 1989.

650 A.2d 1127

**Arthur DAVIS, Administrator of the Estate of Betty Jean Davis, Deceased and Arthur Davis, in his own right and Maurice Davis, Appellants,**

v.

**CITY OF PHILADELPHIA.**

Commonwealth Court of Pennsylvania.

Argued Oct. 3, 1994.

Decided Nov. 10, 1994.

336

Kenneth L. Mirsky, for appellants.

Alan C. Ostrow, Deputy City Sol., for appellee.

Before COLINS, President Judge, and PELLEGRINI and NEWMAN, JJ.

PELLEGRINI, Judge.

Arthur Davis, as administrator of the estate of Betty Jean Davis (Deceased) and in his own right as her parent, and Maurice Davis, her child, (collectively, Davis) appeal the order of the Court of Common Pleas of Philadelphia County (trial court) granting summary judgment to the City of Philadelphia (City).

Davis filed a negligence suit against the City alleging wrongful death. The factual allegations were as follows: Decedent was falsely arrested by City police officers on November 5, 1987, and was taken to a local police station and then to the Police Administration Building in Philadelphia. Decedent was a diabetic in need of continuous medical care. She was wearing a medical alert bracelet indicating this condition and that information was noted in the police log book. While she was in custody, she became ill, but no medical care was provided. Shortly after being released, she died from insulin shock. The City denied that Decedent made them aware of her diabetic condition or that she was ill while she was in custody. The City also raised immunity under

what is known as the Political Subdivision Tort Claims Act (Tort Claims Act), 42 Pa.C.S. §§ 8541–8564.[1]

■ The City filed a motion for summary judgment based on its governmental immunity. At the hearing on the motion for summary judgment, Davis requested leave to amend the complaint to add a claim under 42 U.S.C. § 1983 to this action, admitting that he had voluntarily discontinued his federal court action under Section 1983, but arguing that he had done so in reliance on the waiver provision in Section 21.701 of the Philadelphia Code.[2] The trial court denied the request to amend the complaint because the statute of limitations on the Section 1983 claim was two years and had run, making an amendment raising a new theory of liability time barred. Because under *City of Philadelphia, Police Department v. Gray*, 534 Pa. 467, 633 A.2d 1090 (1993), the former waiver provision contained in the City's ordinances was held to be inconsistent with the Tort Claims Act and invalid from the time of the enactment of the Tort Claims Act, the trial court then granted the City's motion for summary judgment, holding that the City is permitted to claim governmental immunity even though the cause of action arose before the ordinance was declared invalid. Davis then filed this appeal.[3]

1. Davis filed an additional action for Decedent's death alleging a civil rights violation under 42 U.S.C. § 1983. That action was removed to federal court and subsequently dismissed by stipulation of the parties.

2. Section 21–701 of the Philadelphia Code was enacted in 1962 and, as amended, provided:

(a) The City shall not plead governmental immunity as a defense in any civil action commenced by any person sustaining bodily injury or death caused by negligence or unlawful conduct of any police officer while the latter is acting within the scope of his office or employment. . . .

This section was repealed on December 4, 1990, and the repealer stated that it was effective immediately as to all pending civil actions and all civil actions commenced on or after that date.

3. Our review of a grant of summary judgment is limited to determining whether the trial court abused its discretion or committed an error of law. *Bowles v. Southeastern Pennsylvania Transportation Authority*, 135 Pa.Commonwealth Ct. 534, 581 A.2d 700 (1990). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party

■ Davis contends because the incident occurred and the action was filed before the Supreme Court's decision in *Gray,* that the holding in *Gray* should not be applied retroactively. In any event, Davis contends, he should be allowed to amend the complaint and resurrect the Section 1983 action. The City counters that because the Supreme Court determined in *Gray* that the waiver provision itself was invalid, the waiver didn't lawfully exist at the time the cause of action arose and cannot prevent the City from claiming governmental immunity. It also contends that the complaint cannot be amended to allow for Section 1983 because it is a new cause of action outside the applicable statute of limitations.

As to the issue of whether *Gray* applies retroactively, the Supreme Court in *Gray* held that the City's waiver ordinance was invalid relying on Section 802(c) of the original Political Subdivision Torts Claim Act[4] which, as enacted, provided that "[a]ll other acts or parts of acts are repealed to the extent of any inconsistency."[5] The Supreme Court stated:

[W]e found in *Mascaro v. Youth Study Center,* 514 Pa. 351, 523 A.2d 1118 (1987), that an absolute rule of governmental immunity was stated in 42 Pa.C.S. § 8541. Similarly in In re: *Upset Sale of Properties Against Which Delinquent 1981 Taxes Were Returned to the Tax Claim Unit On or About the First Monday of May 1982 (Skibo Property),* 522 Pa. 230, 560 A.2d 1388 (1989), we stated that the defense of governmental immunity is an absolute defense, directly analogous to our holding in workmen's compensation cases and is not waivable nor is it subject to any procedural devise

is entitled to a judgment as a matter of law." Pa.R.C.P. No. 1035(b); *Peterson v. Philadelphia Housing Authority,* 154 Pa.Commonwealth Ct. 309, 623 A.2d 904 (1993).

4. Act of November 26, 1978, P.L. 1399, *as amended, formerly* 53 P.S. § 5311.802(c).

5. The Supreme Court noted that a similar provision to Section 802(c) can be found in Section 8563(a), which provides:

A local agency may promulgate rules and regulations not inconsistent with this subchapter in order to implement the intent of this subchapter.

42 Pa.C.S. § 8563(a).

that could render a governmental agency liable beyond the exceptions granted by the legislature. . . .

Because the City of Philadelphia waived immunity under Section 21–701 and rendered the City of Philadelphia liable beyond the exceptions granted by the legislature, we now hold that Philadelphia Code Section 21.701 is inconsistent with the Political Subdivision Tort Claims Act and is therefore invalid.

*Gray*, 534 Pa. at 474–75, 633 A.2d at 1093–94.

■ Davis argues that *Gray* should not be retroactively applied to his case because the cause of action accrued and the action was filed while the waiver ordinance was in effect. However, in Pennsylvania and at common law, decisions changing the law are retroactive and are usually applied to cases pending on appeal. *McCloskey v. Workmen's Compensation Appeal Board*, 501 Pa. 93, 98 n. 3, 460 A.2d 237, 239 n. 3 (1983); *August v. Stasak*, 492 Pa. 550, 554, 424 A.2d 1328, 1330 (1981). If such decisions rely upon statutory interpretations, they relate back to the date the particular statute became effective, because they merely interpret existing legislation. *McCloskey; Fairbanks v. Travelers Insurance Company*, 337 Pa.Superior Ct. 39, 42–43, 486 A.2d 469, 471 (1984).

Because the Supreme Court held in *Gray* that the waiver ordinance was invalid because it was inconsistent with the original Political Subdivision Tort Claims Act under Section 802(c), the decision is properly applied retroactively to the effective date of the Tort Claims Act as an interpretation of existing legislation. This cause of action arose in 1987, well after the enactment of the original Political Subdivision Tort Claims Act made the waiver ordinance invalid. We affirm the trial court's finding of immunity for the City.[6]

■ Davis also contends that the trial court erred in denying his request to amend the complaint because the amendment does not amplify or enlarge the existing cause of action.

6. There was no argument made that the City or its police officers' actions fell within an exception to the governmental immunity and we do not believe that any exception applies.

Although admitting that the statute of limitations has run on the Section 1983 claim,[7] and that they discontinued the federal action voluntarily, he argues that it is unfair not to allow them to amend because he relied on the waiver ordinance and had no way of knowing the Supreme Court's decision invalidating it would be applied retroactively.

■ An amendment introducing a new cause of action will not be permitted after the statute of limitations has run in favor of a defendant. *Hodgen v. Summers*, 382 Pa.Superior Ct. 348, 555 A.2d 214 (1989), *petition for allowance of appeal denied*, 522 Pa. 619, 563 A.2d 888 (1989).

> In determining whether a wholly different cause of action is introduced by the amendment, technical considerations or ancient formulae are not controlling; nothing more is meant than that the defendant shall not be required to answer a wholly different legal liability or obligation from that originally stated.... The tests to be applied when the question presented is whether an amended [complaint] presents a new and different cause of action are, would a judgment bar any further action on either, does the same measure of damages support both, is the same defense open in each, and is the same measure of proof required?

*Id.* 382 Pa.Superior Ct. at 350, 555 A.2d at 215 (quoting *Sanchez v. City of Philadelphia*, 302 Pa.Superior Ct. 184, 187–88, 448 A.2d 588, 589–90 (1982)); *see also Saracina v. Cotoia*, 417 Pa. 80, 208 A.2d 764 (1965).

■ Although the same conduct may give rise to both claims, a comparison between a tort claim on the theory of ordinary negligence and a constitutional tort under Section 1983 shows that there are substantial differences between them. First of all, a negligence claim is brought under the

7. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizens of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

state common law, while a Section 1983 claim is a federal cause of action created by Congress pursuant to direct authorization contained in Section 5 of the Fourteenth Amendment investing Congress "with the power to enforce the Fourteenth Amendment with appropriate legislation." A different governmental entity created the Section 1983 claim than the one which allowed common law remedies, and for different reasons—one to enforce the Fourteenth Amendment and one to compensate individuals for harm done by the negligence of others. Consequently, a different measure of proof is required in a negligence action as opposed to a Section 1983 action. An ordinary negligence action requires a showing that the plaintiff was damaged by the defendant's breach of a duty of ordinary care. Although we have previously decided that just because a plaintiff has not specifically set forth the statute by stating a "Section 1983" cause of action does not mean the claim cannot be pursued; to maintain such an action, a plaintiff is required to allege first that a person or persons deprived him of some cognizable federal right, privilege or immunity, and second, that the person or persons deprived him of that right while acting under the color of state law. *Heinly v. Commonwealth*, 153 Pa.Commonwealth Ct. 599, 621 A.2d 1212 (1993). *See also Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Uram v. County of Allegheny*, 130 Pa.Commonwealth Ct. 148, 567 A.2d 753 (1989).

Moreover, because respondent superior does not apply, the touchstone of the Section 1983 action against a governmental body is an allegation that an official policy, custom or usage is responsible for a deprivation of rights protected by the Constitution. *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978); *Balent v. City of Wilkes–Barre*, 167 Pa.Commonwealth Ct. 556, 648 A.2d 1273 (1994). Relevant to this case, for the Fourteenth Amendment to apply to find a violation of civil rights, there must be deliberate indifference to a person's medical needs by a custodial official acting under color of state

law. *Diaz v. Houck,* 159 Pa.Commonwealth Ct. 274, 632 A.2d 1081 (1993). No such allegations of an official policy or custom or of deliberate indifference were made in this case nor are they necessary in an ordinary negligence claim.

Secondly, the same defenses are not available in a Section 1983 case as in a negligence case. Unlike a claim brought under a negligence theory, under Section 1983, governmental immunity is not a defense. *Martinez v. California,* 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 558 n. 8, 62 L.Ed.2d 481 (1980); *Heinly.* Moreover, additional defenses, such as that there was no policy or custom or a lack of deliberate indifference, are available to the City in a Section 1983 action.[8]

Based on these factors, it is clear that a Section 1983 claim proposes a different legal theory and requires additional facts to support it; therefore, it is a new cause of action.[9] Although Davis argues it is unfair to preclude this claim now when the federal court action was discontinued in reliance on the waiver ordinance, the discontinuance of the action was a voluntary choice and it is unfair to require a defendant to answer a new and different legal theory when the statute of limitations has run in favor of that defendant. Accordingly, the trial court properly denied Davis' request to amend his complaint because the proposed amendment would add a new cause of action beyond the statute of limitations.

**8.** Although the two claims have similar measures of damages, that similarity is not enough to overcome the differences in the measure of proof and the defenses available. Additionally, the question of whether a judgment would bar further action on either asserted claim is essentially asking if res judicata would apply. However, the determination of whether res judicata applies is partly based on whether there are separate causes of action, making that factor circular and unhelpful. *See Sanchez,* 302 Pa.Superior Ct. at 188 n. 2, 448 A.2d at 590 n. 2.

**9.** Our determination that a Section 1983 claim is a new cause of action concurs with the decision in *Melvin v. City of West Frankfort,* 93 Ill.App.3d 425, 48 Ill.Dec. 858, 417 N.E.2d 260 (1981). In *Melvin,* the complainant alleged that the city denied him a position as a firefighter in violation of either the state constitution or the Fourteenth Amendment and sought to amend to add a claim under Section 1983. The appellate court of Illinois held that the complainant "urges an entirely new Federal statutory cause of action" and denied leave to amend the complaint. *Id.* at 434, 417 N.E.2d at 266.

## ORDER

AND NOW, this 10th day of November, 1994, the order of the Court of Common Pleas of Philadelphia County dated January 14, 1994, No. 1505 June Term 1988, is affirmed.

650 A.2d 1131

**Dennis P. HILL, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 30, 1994.

Decided Nov. 14, 1994.

344

Robert P. Hagan, for appellant.

Timothy P. Wile, Asst. Counsel In–Charge Appellate Section, for appellee.

Before McGINLEY and NEWMAN, JJ., and LORD, Senior Judge.

LORD, Senior Judge.

Dennis Hill appeals an order of the Delaware County Court of Common Pleas which denied his appeal of a five-year revocation of his driver's license by the Department of Transportation (DOT) under the Vehicle Code's habitual offender provision, 75 Pa.C.S. § 1542.

Hill was convicted of three violations of the Vehicle Code arising from a single incident occurring on February 27, 1992. Hill had been driving under the influence of alcohol when he hit a second car into a third vehicle, an occupant of which was injured. DOT suspended his license for six months for the violation of leaving the scene of an accident involving death or injury, one year for leaving the scene of an accident involving damage to a vehicle and revoked his license for five years for

driving under the influence of alcohol or controlled substance. DOT imposed the two suspensions pursuant to 75 Pa.C.S. § 1532. It imposed the five-year revocation for the third violation based on the habitual offender statute, which provides:

> (a) General rule.—The department shall revoke the operating privilege of any person found to be a habitual offender pursuant to the provisions of this section. A 'habitual offender' shall be any person whose driving record, as maintained in the department, shows that such person has accumulated the requisite number of convictions for the separate and distinct offenses described and enumerated in subsection (b) committed after the effective date of this title and within any period of five years thereafter.
>
> (b) Offenses enumerated.—*Three convictions arising from separate acts* of any one or more of the following offenses committed either singularly or in combination by any person shall result in such person being designated as a habitual offender. . . .
>
> (d) Period of revocation.—The operating privilege of any person found to be a habitual offender under the provisions of this section shall be revoked by the department for a period of five years.
>
> . . . .

75 Pa.C.S. § 1542 (emphasis added).

█ The trial court, in a well-written opinion, denied with some apparent reluctance Hill's challenge to the five-year revocation. Hill now appeals to this Court.[1]

█ Hill's argument in this appeal is that an individual with no prior offenses who receives three convictions arising from two acts in a single incident should not be considered a

---

1. Our scope of review of a trial court decision in a license suspension case is limited to determining whether the court made findings of fact unsupported by substantial evidence, committed an error of law or abused its discretion. *Department of Transportation, Bureau of Driver Licensing v. Lescisin,* 156 Pa.Commonwealth Ct. 666, 628 A.2d 1208 (1993).

habitual offender under the habitual offender statute. Hill expressly does not ground his contention on the fact that the violations occurred in a series of a single event, but instead argues that there were only two acts involved herein, i.e., driving under the influence of alcohol and striking a vehicle; he maintains that the chain reaction which took place, whereby the vehicle he struck in turn struck another vehicle, does not constitute a third act.

In *Frontini v. Department of Transportation*, 527 Pa. 448, 593 A.2d 410 (1991), our Supreme Court held that an appellant's three convictions for homicide by vehicle were not separate acts, but resulted from a single act, and were therefore not to be considered separate offenses under the habitual offender provision. The Court also wrote:

> The apparent thrust of the habitual offender statute is to punish persons who make a 'habit' of violating the more serious provisions of the vehicle code, thus causing themselves to be a menace to the other licensed drivers in Pennsylvania. Thus, the habitual offender statute is recidivist in nature, concerning itself with the number of prior acts committed by the offender, as opposed to the multiple consequences of any one act.…

> Statutes such as these, provide for enhanced penalties for individuals with a propensity to commit repeated offenses of the same type.

*Id.* at 451–452, 593 A.2d at 412.

We relied on *Frontini* in deciding that, under former Section 13(m) of the Drug Act, formerly 35 P.S. § 780–113(m), now replaced by 75 Pa.C.S. § 1532(c), multiple convictions arising out of a single incident constitute only a single offense. *Department of Transportation, Bureau of Driver Licensing v. Perruso*, 160 Pa.Commonwealth Ct. 49, 634 A.2d 692 (1993), *petition for allowance of appeal denied*, 538 Pa. 650, 647 A.2d 904 (1994). The statute there was not expressly recidivist, as is the habitual offender statute by its very title and terms. Nevertheless, we recognized that provisions which are in fact recidivist or enhancement provisions are designed to deter

future criminal behavior, and it is therefore improperly simplistic to treat separate offenses arising from the same incident as two separate offenses under said provisions. *Id.* On the other hand, we also recognized that the habitual offender statute provides specific authority to treat one as a habitual offender for convictions arising from the same incident, in that it defines a habitual offender as one having "[t]hree convictions arising from separate acts of any one or more of the following offenses committed either singularly or in combination ..." *Id.* We then cited *Brewster v. Department of Transportation,* 52 Pa.Commonwealth Ct. 112, 114–115, 415 A.2d 922, 924 (1980), the case which the trial court believed compelled the denial of Hill's appeal, wherein we upheld a five-year revocation under section 1542 for three separate offenses occurring during a single incident:

> The circumstances surrounding appellant's three convictions, it is urged, do not evidence 'habitual' conduct in the common sense. Where, however, the legislature has specifically defined a term, as in Section 1542 it has defined 'habitual offender,' this Court may not frustrate the clear legislative intent by interpreting such term according to its usual and customary meaning in disregard of the legislature's intended usage.

However, as noted above, Hill does not ask this Court to hold in the habitual offender context that multiple convictions arising from the same *incident* constitute a single offense,[2] but instead argues that he committed two, rather than three, *acts* under the statute. We agree with this contention and therefore conclude that the five-year revocation provision under the statute does not apply to Hill. We hold that the two convictions here for leaving the scene of an accident constitute one act for purposes of section 1542. With one act of leaving the scene of an accident, Hill violated 75 Pa.C.S. § 3743, because

**2.** Nevertheless, given the rationale in *Frontini* and portions of the discussion in *Perruso* and *Brewster,* as well as the very nature of the habitual offender statute and the language therein, we must admit it is a plausible argument that, contrary to our earlier holding in *Brewster,* several convictions arising from the same incident, where no prior convictions exist, should be treated as only as a single conviction under the habitual offender statute.

the accident resulted in damage to a vehicle, and 75 Pa.C.S. § 3742, because the accident resulted in injury or death. Hill does not dispute his receiving two convictions. Nor does he suggest that driving under the influence of alcohol was not a separate act. However, as in *Frontini*, and unlike other cases cited herein, here there was clearly a single act that gave rise to multiple convictions.

We disagree with DOT's assertion that two separate acts occurred when 1) Hill hit one vehicle, and 2) when, a split-second later, Hill pushed that vehicle into another vehicle. First, the convictions here were for leaving the scene of an accident in which one is involved. Second, we simply think DOT's assertion is facially too fine of a distinction, particularly in view of the statute and *Frontini*. We also conclude that the cases DOT cites are distinguishable. As we have stated, *Brewster* involved the argument that all offenses arising from a single *incident*, rather than act, constitute only one offense for purposes of section 1542. Moreover, the appellant there committed what, in contrast to this case, are arguably three separate acts—driving under the influence of alcohol, fleeing police and leaving the scene of an accident involving property damage.

Similarly, the appellant in *Melcher v. Commonwealth*, 58 Pa.Commonwealth Ct. 634, 428 A.2d 773 (1981) committed the acts of racing on highways, fleeing police and driving without lights to avoid identification. The Supreme Court in *Frontini* distinguished *Department of Transportation, Bureau of Traffic Safety v. Frye*, 88 Pa.Commonwealth Ct. 380, 489 A.2d 984 (1985), *aff'd*, 514 Pa. 219, 523 A.2d 332 (1987), stating that the defendant in *Frye* committed a series of separate and distinct acts within a narrow time frame. In *Ross v. Department of Transportation, Bureau of Driver Licensing*, 125 Pa.Commonwealth Ct. 256, 557 A.2d 62 (1989), *petition for allowance of appeal denied*, 524 Pa. 623, 571 A.2d 385 (1989), the appellant had a prior conviction before being convicted for what was determined, after close examination of the elements involved in each offense, to be distinct acts of driving without lights to avoid identification and fleeing a police officer. In *Weaver v. Department of Transportation, Bureau of Traffic*

*Safety,* 52 Pa.Commonwealth Ct. 625, 416 A.2d 628 (1980), the appellant committed within ten minutes the acts of driving under the influence of alcohol or controlled substance, fleeing police and leaving the scene of an accident involving property damage. All of these cases involve distinctions in action rather than factual result, and certainly involve greater distinctions than causing injury to a person in one car but only causing damage to another.[3] All of these cases, except *Ross,* predate *Frontini.*

We conclude that the two convictions in this case based on the act of leaving the scene of an accident are directly analogous to the situation in *Frontini,* wherein the appellant, with one act, committed three counts of homicide by motor vehicle and received three convictions and three sentences thereon. We follow our Supreme Court's statement in that case:

> In the present case we have an individual, who by a single act caused multiple consequences. The propriety of the multiple criminal sanctions he must suffer as a result of that act is without question. However, for the purpose of a recidivist penalty it would be unjust, and in derivation of the intent of the statute, to separate out the consequences of this one act in order to catagorize [sic] this individual as a person with a propensity to commit repeated offenses. Wherefore, we find the convictions for homicide by vehicle, having resulted from a single act, are not to be considered as separate offenses for the purposes of classifying this appellant as an habitual offender pursuant to 75 Pa.C.S. § 1542.

*Frontini,* 527 Pa. at 452, 593 A.2d at 412 (footnote omitted).

Accordingly, the trial court's order is reversed and Hill's five-year license revocation is removed.

3. Presumably, if someone in the car that Hill's car hit had been injured, Hill would have faced two counts of violating section 3742, instead of one count under that section and another under section 3743. The general rule language in both sections is identical, except one deals with an accident "resulting only in damage to a vehicle or other property which is driven or attended by any person" and the other deals with an accident "resulting in injury or death of any person."

## *ORDER*

AND NOW, this 14th day of November, 1994, the order of the Court of Common Pleas of Delaware County, No. 93–14398, dated April 6, 1994, is hereby reversed.

650 A.2d 1135

**Louis L. WESSEL, Jr.**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING, Appellant.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 8, 1994.

Decided Nov. 14, 1994.

Timothy P. Wile, Asst. Counsel In–Charge Appellate Section, for appellant.

G. William Bills, Jr., for appellee.

Before SMITH, KELLEY, JJ., and KELTON, Senior Judge.

SMITH, Judge.

The Department of Transportation, Bureau of Driver Licensing (DOT) appeals a September 29, 1993 order of the Cambria County Court of Common Pleas which sustained the appeal of Louis L. Wessel Jr. (Licensee) from a ninety-day suspension of his operating privilege pursuant to Section 13(m) of The Controlled Substance, Drug, Device and Cosmetic Act (Controlled Substance Act), Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. § 780–113(m).[1] The issues raised on appeal are whether the trial court erred as a matter of law when it sustained Licensee's appeal because he was not informed at the time he pleaded guilty to the underlying drug offense of the mandatory suspension of his driving privilege;[2] and whether the trial court erred as a matter of law in determining that a nexus must exist between the Controlled Substance Act violation and the motor vehicle to justify the imposed punishment of license suspension.

1. 35 P.S. § 780–113(m) provides:

 (m) Notwithstanding any other provision in this act, any person, not a registrant, who possesses, sells, delivers, offers for sale, holds for sale or gives away any controlled substance, in addition to any other penalty provided in this or any act, upon conviction for a violation of this act, shall have his or her operating privilege suspended. The clerk of any court of this Commonwealth, within ten days after final judgment of conviction for violations of this act requiring suspension under this section, shall send to the Department of Transportation a record of the conviction on a form provided by the Department of Transportation. When the Department of Transportation suspends the operating privilege of a person under this subsection, the duration of the suspension shall be as follows:

 (1) For a first offense, a period of 90 days from the date of suspension.

 (2) For a second offense, a period of one year from the date of suspension.

 (3) For a third offense, and any offense thereafter, a period of two years from the date of suspension. Any multiple suspensions imposed shall be served consecutively.

2. Section 13(m) of the Controlled Substance Act was amended in 1992 to extend the period of suspension for a first offense from ninety days to six months. This section was repealed by the Act of June 28, 1993, P.L. 137, No. 33, § 7, effective in 60 days. The provisions of this section are now found in essentially similar form at 75 Pa.C.S. § 1543(c).

■ It is uncontested that Licensee was charged with violating Section 13(a)(16) of the Controlled Substance Act, 35 P.S. § 780–113(a)(16), on April 14, 1992; pleaded guilty to the charge on March 16, 1993; and the trial court did not inform Licensee of the mandatory suspension of his driving privilege when he pleaded guilty to the criminal charge. Licensee was notified by letter dated May 13, 1993 that his driving privilege was suspended for ninety days pursuant to Section 13(m) of the Controlled Substance Act as a result of his conviction for violating the Act. Licensee appealed the suspension of his driving privilege and on September 22, 1993, the trial court sustained his appeal.[3]

The trial court sustained Licensee's appeal pursuant to *Duffey v. Department of Transportation, Bureau of Driver Licensing,* 147 Pa.Commonwealth Ct. 280, 607 A.2d 815 (1992) and *Department of Transportation, Bureau of Driver Licensing v. Ahlborn,* 156 Pa.Commonwealth Ct. 196, 626 A.2d 1265 (1993), where this Court held that a license suspension constituted an illegal sentence where the suspension was imposed without the licensee being informed of the civil consequences of a conviction prior to entry of the licensee's guilty plea. Subsequent to the trial court's decision in this case, the Pennsylvania Supreme Court reversed both *Duffey* and *Ahlborn,* and review of the instant appeal will now be made in light of these changes. *See Commonwealth v. Duffey,* 536 Pa. 436, 639 A.2d 1174, *cert. denied,* —— U.S. ——, 115 S.Ct. 223, 130 L.Ed.2d 149 (1994); *Ahlborn v. Department of Transportation,* 537 Pa. 153, 641 A.2d 1166 (1994).

■ DOT maintains that the trial court erred in sustaining Licensee's appeal because suspension of his driving privilege under Section 13(m) of the Controlled Substance Act is a collateral civil consequence of the conviction, and Licensee is not entitled to be informed of the civil sanction when pleading

---

3. In a license suspension appeal, this Court's scope of review is limited to determining whether the trial court's findings are supported by competent evidence, whether errors of law have been committed, or whether the trial court's determinations demonstrate an abuse of discretion. *Department of Transportation, Bureau of Driver Licensing v. Tarnopolski,* 533 Pa. 549, 626 A.2d 138 (1993).

guilty to a violation of the Act. The only relevant issues in a civil license suspension appeal are whether the motorist was in fact convicted and whether DOT acted in accordance with applicable law. *Amoroso v. Department of Transportation, Bureau of Driver Licensing,* 152 Pa.Commonwealth Ct. 215, 618 A.2d 1171 (1992). A valid guilty plea to a drug offense does not require that the defendant be informed that as a consequence of his or her conviction, the defendant's operating privilege will be suspended by DOT under Section 13(m). *Duffey; Ahlborn.*

In *Duffey* the Supreme Court held that the loss of a driving privilege is a collateral consequence of a conviction for underage drinking and there is no requirement that a licensee know of this consequence at the time of the guilty plea nor any obligation on the part of the court to inform defendants of the mandatory suspension. Licensee contends that *Duffey* does not apply in this instance and that his due process rights were violated because his license suspension was a direct result and a part of the same statute to which he was pleading guilty and therefore, the penalty cannot be imposed without notice. Licensee's argument must fail under *Duffey* and *Ahlborn* as well, a case factually similar to this case, in which the Supreme Court reinstated a ninety-day suspension of the licensee's operating privilege pursuant to Section 13(m). In *Ahlborn* licensee was charged with violating Section 13(a)(31)(i) of the Controlled Substance Act; pleaded guilty to the violation; was not informed by the trial court that suspension of his driver's license was mandatory; and was subsequently notified by DOT that his driving privilege would be suspended pursuant to Section 13(m).

DOT also contends that the trial court erred in its determination that a nexus must exist between the Controlled Substance Act violation and a motor vehicle to support the imposed penalty. In other words, the statute is not reasonably related to the legislature's interest in deterring drug use within the Commonwealth. A driver's license is a privilege, not a right, and is subject to the conditions that the legislature places upon that privilege. *Plowman v. Department of Trans-*

*portation, Bureau of Driver Licensing,* 535 Pa. 314, 635 A.2d 124 (1993); *Commonwealth v. Strunk,* 400 Pa.Superior Ct. 25, 582 A.2d 1326 (1990), *appeal denied,* 528 Pa. 630, 598 A.2d 283 (1991). To determine whether the requisite nexus exists between a violation of the Act and a motor vehicle, the Court must examine the legislation affecting the privilege under the two-part rational basis test—does the legislation promote a legitimate state interest or public value and is it reasonably related to accomplishing the articulated state interest. *Plowman; Strunk.*

■ As to the first prong of the test, there is little doubt that a legitimate state interest does in fact exist in deterring or protecting against the proliferation of drug use, and as to the second prong, it is enough that the legislation identifies the potential benefits to the citizens and provides a rational way to promote the state interest to be protected. *Plowman; Strunk.* Because a nexus exists between Wessel's violation of the Controlled Substance Act and suspension of his driving privilege, Wessel's challenge to the license suspension is rejected. More specifically, the trial court was presented with no case to support Wessel's proposition that his license could be suspended only for a violation directly related to the operation of his motor vehicle.

Accordingly, DOT acted pursuant to applicable law in suspending Licensee's driving privilege when notified that he pleaded guilty and was convicted of violating Section 13(a)(16) of the Controlled Substance Act. The trial court's order is therefore reversed and the license suspension is reinstated.

## ORDER

AND NOW, this 14th day of November, 1994, the order of the Court of Common Pleas of Cambria County is reversed and the suspension of Louis L. Wessel Jr.'s operating privilege by the Department of Transportation, Bureau of Driver Licensing, is hereby reinstated.

650 A.2d 1138

**DEPARTMENT OF the NAVY, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD
OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 14, 1994.

Decided Nov. 15, 1994.

As Amended Nov. 21, 1994.

Robert G. Janes, for petitioner.

Sarah C. Yerger, Asst. Counsel, and Clifford F. Blaze, Deputy Chief Counsel, for respondent.

Before DOYLE and KELLEY, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

Department of the Navy, Naval Air Warfare Center (NAWC) appeals from the order of the Unemployment Com-

pensation Board of Review (UCBR) that granted benefits to Henry Muir (Claimant). We reverse.

Claimant worked for NAWC as an electronics mechanic. The Department of the Navy targeted NAWC for closure. NAWC began offering an incentive plan to its employees in order to downsize its facilities. NAWC offered a voluntary separation incentive payment (VSIP) program to employees, which was purely voluntary. NAWC offered separation pay as an incentive for them to leave their jobs. NAWC offered Claimant $25,000 as an incentive to retire.

On May 27, 1993, Claimant completed the VSIP request. In completing this request, Claimant specifically acknowledged that if he accepted the VSIP, he would not be eligible for, among other things, unemployment compensation. (59a.) NAWC advised Claimant that his request for a VSIP to voluntarily retire was approved and that if he were to accept the offer, his retirement would be effective between August 20 and September 29, 1993. Claimant accepted the VSIP to voluntarily retire, noting his preferred retirement date as August 31, 1993. Claimant was of normal retirement age when he terminated his employment on August 31, 1993.

On January 28, 1994, Claimant filed for unemployment benefits which were granted by the Job Center. NAWC appealed and a hearing was held before a referee. The referee denied Claimant benefits under Section 402(b) of the Pennsylvania Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(b). Claimant appealed and the UCBR reversed, finding Claimant was not ineligible for benefits under Section 402(b) of the Law because his unemployment was due to his voluntarily leaving work with cause of a necessitous and compelling nature.

On appeal,[1] NAWC argues that two of the UCBR's

1. Our scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. 2 Pa.C.S. § 704.

findings of fact are not supported by substantial evidence.[2] These findings of fact are:

4. The job force, including the claimant, was informed that their jobs were being eliminated and that a move to Maryland was imminent.

\* \* \* \* \* \*

11. The claimant believed the employer was moving to Maryland within a year, and he would no longer have employment.

NAWC argues that no substantial evidence supports these findings and, in fact, Claimant's own testimony contradicts these findings made by the UCBR. We agree.

The only testimony by Claimant concerning Findings of Fact Nos. 4 and 11, is set forth as follows:

R. Okay, now, so if you decided to stay then, could you have continued to work in your position?

C. Yeah, I believe so.

(52a–53a.)

R. Now, was there any other reason why you left the [NAWC] when you did other than to accept the voluntary retirement incentive, severance incentive?

C. Well, it was—the way things looked, they were moving to Maryland, perhaps next year, and it looked like I wouldn't have a job. And I would say around the spring of 1993, we have very little work to do in the shop. And about that time in the spring they sent us—we received letters about that they were overstaffed by about—I think it was 150 people. And they were asking for volunteers to take ... leave without pay and like—later on they came out— they sent me a letter about this VSIP, voluntary separation, with $25,000 and, I believe they sent it to everybody who was eligible for immediate retirement. So I put my name on the list for it, and it seemed like quite a long time went

2. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383 (1985).

by, and they had sent—it went through quite a process, going through personnel and the Navy Department. Let's see—I'm getting confused now myself. But eventually I was accepted, and I believe what they do is *I think they eliminate your job.* It's stated on the back of the VSIP form. I believe your job is more or less eliminated.

\* \* \* \* \* \*

L. When was your job scheduled to be moved to Maryland?

C. At the time I didn't know, but talking to some of my friends in the shop they believed that they're supposed *to be there in April of 1995,* after I left. Before it looked—just guessing—I would guess that's when they would have gone, just from the way things were happening.

(56a–57a) (emphasis added). Based on Claimant's testimony, the UCBR's Findings 4 and 11 are not supported by the evidence in that Claimant testified he had continuing employment and only *believed* that his job would have been eliminated when he left. Employer testified that Claimant's job had not been abolished and would have still been available had Claimant not accepted the VSIP. Employer testified that Claimant's job would have been available until March of 1995, almost two years after Claimant requested the VSIP. We have carefully reviewed the record and based upon the testimony of the parties, as a whole, the UCBR's Findings 4 and 11 are not supported by the evidence.

 Whether a claimant has a necessitous and compelling cause for terminating his employment is a legal question fully reviewable by this Court. *Anchor Darling Valve Co. v. Unemployment Compensation Board of Review,* 143 Pa.Commonwealth Ct. 171, 598 A.2d 647 (1991). When, as here, a claimant voluntarily terminates his employment, the burden is upon him to show cause of a necessitous and compelling nature for having done so. *Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 378 A.2d 829 (1977). Necessitous and compelling cause is such that "results from circumstances which produce pressure to terminate employ-

ment and is both real and substantial, and which would compel a reasonable person under the circumstances to act in the same manner." *Id.* at 358–59, 378 A.2d at 832–33.

■ The circumstances surrounding Claimant's termination as testified to by Claimant demonstrates some uncertainty about his job situation, apparent overstaffing in the work place and a request for volunteers to take leave without pay. However, uncertainty and speculation about the future existence of a job does not create necessitous and compelling cause. *Goffi v. Unemployment Compensation Board of Review,* 58 Pa.Commonwealth Ct. 422, 427 A.2d 1273 (1981) (a college professor who resigned in the face of a dean's recommendation that he be terminated was not entitled to benefits since no definite determination about his status had been made by anyone with the actual authority to fire him); *Gackenbach v. Unemployment Compensation Board of Review,* 51 Pa.Commonwealth Ct. 475, 414 A.2d 770 (1980) (an unfavorable performance evaluation created no imminent threat of termination but merely a possibility of a future occurrence, at least three to four months away, and thus, resignation was not deemed a necessitous and compelling reason); *Rizzitano v. Unemployment Compensation Board of Review,* 32 Pa.Commonwealth Ct. 59, 377 A.2d 1060 (1977) (an employer threat that a claimant would be fired if he did not increase productivity created no more than a possibility of a future discharge and did not justify terminating his employment).

In *Flannery v. Unemployment Compensation Board of Review,* 125 Pa.Commonwealth Ct. 64, 557 A.2d 52 (1989), a claimant who chose to retire under his employer's voluntary retirement plan argued that his eventual lay-off was inevitable, yet we found this argument speculative because the employer introduced evidence that continuing work was available. Here, Employer testified that Claimant's position was secure through March 1995 and Claimant also testified that if he had decided to stay, continuing work was available. (52a–53a.) Therefore, we hold that Claimant's belief that his termination was imminent was speculative and contrary to the facts, and

that he did not meet his burden that he quit for necessitous and compelling reasons.

Accordingly, we reverse.

## ORDER

AND NOW, this 15th day of November, 1994, the order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby reversed.

650 A.2d 1141

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING, Appellant**

v.

**Todd KORENICH, Appellee.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 3, 1994.

Decided Nov. 15, 1994.

William A. Kuhar, Jr., Asst. Counsel–Appellate Section and Timothy P. Wile, Asst. Counsel In–Charge Appellate Section, for appellant.

No appearance for appellee.

Before DOYLE and KELLEY, JJ., and NARICK, Senior Judge.

DOYLE, Judge.

The Department of Transportation (DOT) appeals an order of the Court of Common Pleas of Allegheny County which

modified the period of revocation of the operating privileges of Todd Korenich.

The facts are undisputed. On November 10, 1987, Korenich pled guilty to a multi-count information arising out of two unrelated incidents or episodes which occurred on June 16, 1987, and July 9, 1987. On each occasion Korenich was arrested for, among other things, possessing a stolen vehicle. In his brief to the trial court, Korenich admitted that on June 16, 1987, he was in possession of a 1984 Chevrolet Camaro, which was subsequently determined to be stolen, and that he had fraudulently altered the vehicle identification numbers and the owner's registration. Similarly, on July 9, 1987, he was in possession of a Chevrolet Camaro Z28, which was also determined to be stolen and to have fraudulently altered identification numbers and owner's registration. As a result of his guilty plea, he was convicted of four violations of the Vehicle Code [1] and four violations of the Crimes Code.[2] On November 10, 1987, he was sentenced for all of the convictions to seven years probation and ordered to pay $9000 in restitution.

During the period of May 1988 through August 1988, the Department of Transportation issued eight notices of revocation on eight different dates. Each of the revocation notices were predicated on Korenich's November 1987 convictions, and revoked his operating privileges for a total of seventeen years pursuant to Sections 1532 and 1542 of the Vehicle Code (VC or Vehicle Code), 75 Pa.C.S. §§ 1532 and 1542.

---

1. Specifically, Korenich violated the following provisions of the Vehicle Code:

 Two counts of violating Section 7103(b), 75 Pa.C.S. § 7103(b) (dealing in vehicles with removed or falsified identification numbers);
 One count of violating Section 7102(b), 75 Pa.C.S. § 7102(b) (removal or falsification of identification numbers);
 One count of violating Section 7111, 75 Pa.C.S. § 7111 (dealing in titles and plates for stolen vehicles).

2. The relevant sections of the Crimes Code to which Korenich pled guilty are Section 3925, 18 Pa.C.S. § 3925 (receiving stolen property), and Section 3921, 18 Pa.C.S. § 3921 (theft).

■ Korenich appealed all of the revocations to the trial court in four statutory appeals.[3] The trial court consolidated the appeals, and, in four orders entered on August 15, 1990, vacated or modified seven of the eight revocations. Korenich did not appeal any of these orders. DOT appeals one order of the trial court which decided four revocations encompassed within four notices of revocation mailed between August 1, 1989, and August 10, 1989.[4] In these four notices DOT revoked Korenich's operating privileges for eight years. The trial court vacated two of the revocations and modified two of the revocations, which reduced Korenich's revocation period from eight years to six years.[5]

All of the issues on appeal are derived from the last DOT notice of revocation dated August 10, 1988.[6] That notice,

3. Where all of the licensee's criminal convictions were obtained at a single proceeding and the licensee's sole and individual operating privilege is suspended or revoked, a licensee may file a single statutory appeal from multiple notices of revocation or suspension. *Hettich v. Department of Transportation, Bureau of Driver Licensing,* 166 Pa.Commonwealth Ct. 71, 646 A.2d 34 (1994); *Department of Transportation, Bureau of Driver Licensing v. Perruso,* 160 Pa.Commonwealth Ct. 49, 634 A.2d 692 (1993).

4. DOT also appealed a second order of the common pleas court dated August 15, 1990, but that appeal has been withdrawn.

5. Overall, Korenich had his revocation time reduced from seventeen years to six years.

6. The trial court disposed of three other notices of revocation in the same order, in the following manner.

The court vacated the August 1, 1988 notice of revocation which was predicated on Korenich's conviction for violating Section 3921(a) of the Crimes Code (theft of movable property) because (1) Section 3921 is a misdemeanor and (2) a court did not determine that a vehicle was essentially involved, hence there was no basis for the revocation pursuant to either Section 1532 or Section 1542 of the Vehicle Code. Section 1532(a)(1) of the Vehicle Code; Section 1542(b)(5) of the Vehicle Code.

The August 5, 1988 revocation was predicated on Korenich's conviction of Section 7102(b) of the Vehicle Code, and revoked his operating privileges as a habitual offender. Since the trial court had vacated the revocations in other orders, Korenich had not committed the requisite number of offenses. However, the trial court found that Korenich was subject to a one year suspension pursuant to Section 1532(a) of the Vehicle Code.

The August 8, 1988 revocation was based on Korenich's conviction of violating Section 7111 of the Vehicle Code. Based on the trial court's

which revoked Korenich's license for two years pursuant to VC Section 1542(e), was based on Korenich's conviction of violating VC Section 7103(b) (dealing in vehicles with falsified identification numbers) on June 16, 1987. The trial court had previously held that Korenich was a habitual offender as defined by Section 1542(b) of the Vehicle Code, since he had been convicted of three other offenses arising from separate acts within five years, including a conviction for another violation of VC Section 7103(b). (*See* note 5, *supra.*) The conviction at issue in DOT's August 10, 1988 notice was Korenich's fourth conviction in five years, and a licensee who has had four convictions (as enumerated in Section 1542 of the Vehicle Code, arising from separate acts) is assessed an additional two-year revocation pursuant to Section 1542(e). In disposing of the August 10, 1988 notice, the trial court concluded that Korenich's conviction of VC Sections 7102(b) and 7103(b) during the same June 16, 1987 episode, were not "separate acts" within the meaning of VC Section 1542:

> [A] review of the records of the criminal case ... indicates that Appellant *committed but a single act* which led to his pleading guilty to Sections 7102(b) and 7103(b) of the Vehicle Code; i.e., he removed or falsified an identification number of a vehicle (§ 7102(b)), and he had in his possession the same vehicle, knowing that the identification number had been removed or falsified (§ 7103(b)).

(Trial court opinion at 3–4.) (Emphasis added.) Accordingly, the trial court held that DOT's assessment of a two-year

previous disposition of the various revocation notices, it found that the violation constituted Korenich's third conviction within a five year period for separate and distinct offenses enumerated in Section 1542(b) and therefore he was subject to a five year revocation as a habitual offender. This conclusion was based on the following violations:

1. Violation of Section 7103(b) of the Vehicle Code committed on July 9, 1987 (May 13, 1988 Notice of Revocation affirmed by the trial court and not appealed).

2. Violation of Section 7102(b) of the Vehicle Code committed on June 16, 1987 (August 5, 1988 Notice of Revocation, modified by the trial court in its August 15, 1990 order).

3. Violation of Section 7111 of the Vehicle Code committed on June 16, 1987 (August 8, 1988 Notice of Revocation).

revocation pursuant to Section 1542(e) for a fourth conviction was improper and vacated the August 10 notice.

On appeal DOT argues that the trial court erred in failing to impose a two-year revocation under Section 1542(e) as a matter of law. In the alternative DOT argues that even if the two convictions do "merge" for the purposes of Section 1542, Korenich is subject at least to an additional one-year revocation pursuant to VC Section 1532(a).

■ DOT first argues that Korenich's operating privileges should be revoked for two years under VC Section 1542(e) for his conviction of VC Section 7103. Section 1542 provides, in relevant part:

(a) General rule.—The department shall revoke the operating privilege of any person found to be a habitual offender pursuant to the provisions of this section. A "habitual offender" shall be any person whose driving record, as maintained in the department, shows that such person has accumulated the requisite number of convictions for the separate and distinct offenses described and enumerated in subsection (b) committed after the effective date of this title and within any period of five years thereafter.

(b) Offenses enumerated.—Three convictions *arising from separate acts* of any one or more of the following offenses committed either singularly or in combination by any person shall result in such person being designated as a habitual offender:

(1) Any offense set forth in section 1532 (relating to revocation or suspension of operating privilege).

. . . .

(e) Additional offenses.—**Any additional offense committed within a period of five years shall result in a revocation for an additional period of two years.**

75 Pa.C.S. § 1542 (emphasis added).

This Court reviewed Section 1542 in *Ross v. Department of Transportation, Bureau of Driver Licensing*, 125 Pa.Commonwealth Ct. 256, 557 A.2d 62, *petition for allowance of appeal denied*, 524 Pa. 623, 571 A.2d 385 (1989). We defined

the phrase "separate acts" within the meaning of Section 1542 thus:

> Basically, this means that although all three [Vehicle] Code violations may be committed in combination in the course of one general factual episode, the driver must also have done three completely different improper things which led to those Code violations in order to be considered a habitual offender.

*Id.* at 258–59, 557 A.2d at 63. The Supreme Court's holding in *Frontini v. Department of Transportation,* 527 Pa. 448, 593 A.2d 410 (1991), is also on point. In that case, the licensee struck another vehicle, killing three of its occupants. He subsequently pled guilty to, among other things, driving under the influence and *three* counts of homicide by motor vehicle. DOT imposed a one-year revocation for DUI pursuant to Section 1532, a second year under Section 1532 for one homicide, a five-year revocation based on the licensee's designation as a habitual offender under Section 1542(b) for the second homicide, and an additional two-year revocation for the third homicide under Section 1542(e). Reversing this Court, the Supreme Court held that:

> as the three convictions arose from a single act, they cannot be counted as separate offenses for the purpose of imposing penalties under the habitual offender statute.

*Id.,* 527 Pa. at 449, 593 A.2d at 411.

■ Thus, in order to determine whether the licensee has done "completely different improper things," it is necessary to examine the nature of the offenses which give rise to a particular licensee's designation as a habitual offender. This analysis has been described by this Court in *Department of Transportation, Bureau of Driver Licensing v. Maddesi,* 138 Pa.Commonwealth Ct. 467, 588 A.2d 580 (1991):

> [S]eparate and distinct offenses are not merged into a single act merely because a licensee's conduct occurred during one continuous episode. Nor do the acts coalesce merely because the citations read that they occurred at the same time. In sum, we concluded that the test to be applied is

whether each violation requires proof of a fact which the other does not. In other words, ... separate assignment of [penalties] for multiple violations arising from the same act [is prohibited] only where proof of one violation also proves another violation.

*Id.* at 473, 588 A.2d at 583 (citations omitted).[7]

DOT argues that, in the abstract, the elements of Section 7102 of the Vehicle Code (dealing in vehicles with falsified identification numbers) require proof of different facts than are required under Section 7103 (falsification of identification numbers) and therefore Korenich's violations, as a matter of law, arose from separate acts. DOT misconstrues the *Maddesi* test. It is not enough to simply analyze the elements of an offense without consideration of the factual proof which underlies each element.

 Section 7102 of the Vehicle Code requires the Commonwealth to prove three elements: (1) that a person willfully; (2) removes or falsifies the vehicle identification numbers on the vehicle or its various parts; (3) with intent to conceal or misrepresent the identity of a vehicle. 75 Pa.C.S. § 7102. Conversely, Section 7103 of the Vehicle Code punishes a person who (1) buys, receives, possesses, sells or disposes of a vehicle or its parts, (2) with knowledge that the identification numbers have been removed or falsified, (3) with intent to conceal or misrepresent the identity of a vehicle. 75 Pa.C.S. § 7103. After reviewing the criminal record, the trial court, in its August 15, 1990 order, found as fact that "it is clear that the *identical facts* underlying Appellant's conviction under Section 7102(b) ... also underlay his conviction under Section 7103(b)...." (Emphasis added.) Thus, Korenich's conviction under Section 7102 did not turn on the proof of a fact which was not the basis of his conviction under Section 7103, *i.e.*, Korenich knew that the vehicle identification number had been removed or falsified because he had removed the number

## *ORDER*

